[No. S039632. July 11, 2005.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT PAUL WILSON, Defendant and Appellant.

COUNSEL

Timothy J. Foley, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, John R. Gorey and Chung L. Mar, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

CHIN, J.—In 1988, a jury convicted defendant Robert Paul Wilson of the first degree murder (Pen. Code,[1] §§ 187, 189) and robbery (§ 211) of Roy Swader, found that defendant used a firearm in the commission of each offense (§ 12022.5, subd. (a)), and found true a special circumstance allegation that he committed the murder during the course of a robbery. (§ 190.2, former subd. (a)(17)(i), now subd. (a)(17)(A).) The jury returned a verdict of death.

On petition for writ of habeas corpus, we concluded defense counsel provided ineffective assistance by failing to object to certain testimony and tape recordings rendered inadmissible under *Massiah v. United States* (1964) 377 U.S. 201, 206 [12 L.Ed.2d 246, 84 S.Ct. 1199]. (*In re Wilson* (1992) 3 Cal.4th 945 [13 Cal.Rptr.2d 269, 838 P.2d 1222].) We vacated the judgment in its entirety. (*Id.* at p. 958.) We also dismissed the companion automatic appeal as moot. (*People v. Wilson* (1992) 3 Cal.4th 926 [13 Cal.Rptr.2d 259, 838 P.2d 1212].) However, "in an attempt to avoid the recurrence of error on retrial, we discuss[ed] certain issues for the guidance of the parties and the trial court on remand." (*Id.* at p. 930.)

On retrial in 1994, a jury again convicted defendant of first degree murder (§§ 187, 189) and second degree robbery (§ 211), and found true the robbery special-circumstance allegation. (§ 190.2, subd. (a)(17).) It also found true the enhancement allegations that defendant personally used a firearm in the commission of the murder and robbery (§ 12022.5, subd. (a)), and that he was armed with a firearm in the commission of the offenses. (§ 12022, subd. (a)(1).) The second jury also returned a verdict of death.

The trial court denied the automatic motion to reduce the penalty to life imprisonment without the possibility of parole (§ 190.4), and sentenced defendant to death. This appeal is automatic. (§ 1239.) For reasons that follow, we affirm the judgment.

I. FACTUAL AND PROCEDURAL BACKGROUND

A. *Guilt Phase*

1. *Prosecution Evidence*

On September 5, 1984, Long Beach police found Roy Swader's body inside a van in a parking lot. All the van's windows were rolled up and the doors were locked. There was no evidence of a struggle.

---

[1] All further statutory references are to the Penal Code unless otherwise noted.

The cause of death was two gunshot wounds to his head. Either shot could have been fatal. Swader's left front pocket was pulled outwards and his belt was undone. A receipt from a Shell gas station in Indio was found in Swader's shirt pocket. No wallet was found, although Swader was known to carry a "trucker's wallet" in his left pocket, secured to his belt by a chain.

The prosecution presented evidence that Swader lived in Tucson, Arizona with his two young daughters. He made a living buying tools in Paramount, California, and then selling them at a swap meet in Tucson. Normally taking one adult with him on his trips to California, Swader bought the tools with cash and would often carry between $1,500 to $3,000 in his trucker's wallet. He also carried a revolver for protection.

In the summer of 1984, defendant[2] worked for Swader at the Tucson swap meet. He often accompanied Swader to California and helped him load and unload the tools. Defendant moved in with Swader for a month between July and August 1984, and afterwards moved in to the Tucson home of Sonya Cravens[3] and Wayne Anderson.[4]

More than a week before the murder, Kimberlee Jost, who worked at the swap meet and knew Swader, was at Cravens and Anderson's home when defendant was there. Defendant stated he was at Swader's apartment while Swader was counting money on the kitchen table. Defendant said "there was four fucking thousand dollars on the table" and that he "was tempted to knock [Swader] off because he could live good on four fucking thousand dollars." Jost also testified that after Swader's death, defendant came up to Jost at the swap meet and told her "for no reason" that he had not gone with Swader to California, but instead had been partying with a friend in Sabino Canyon, Arizona.

On September 4, 1984 (one day before he was found dead), Swader left Tucson for California in his van and trailer. He stopped for gas in Indio later that day. Robert Berrie, the gas station attendant, testified that he recognized Swader because he would stop at the station each week. That day, Swader was driving the van and defendant was the only other occupant. Berrie positively identified defendant in a photographic lineup and in court. Swader paid for the gas with cash, which he carried in his trucker's wallet, and obtained a receipt.

---

[2] Defendant was also known as "City," and "Blake Richards."

[3] Cravens changed her name to Niemi after she got married. For convenience, we will refer to her as Cravens.

[4] Anderson's real name was Harold Wayne Wilson. He was also known as "Richard Dume," "Rick Wilson," "Rick Anderson," and "Wayne Williams." For convenience, we will refer to him as Anderson.

When Long Beach police discovered Swader's body in his van, they also found a black T-shirt and a pair of jeans, which were later identified as similar to clothing that defendant usually wore. A fingerprint lifted from the van matched the middle finger of defendant's left hand.

After defendant was arrested in October in Las Vegas, Detectives Collette and Miller traveled there to speak to him. Defendant stated he was glad to see them because he was arrested for murder and did not know who was dead. After detectives told him that it was Swader and that his body was found in his van in Long Beach, defendant said that he made several trips to California with Swader to purchase tools, and that the last trip he took with him was on or about August 13. Defendant also mentioned that on these trips Swader carried large amounts of cash and a revolver, and that he would often stop at an Indio gas station on the way.

After Detective Collette accused defendant of lying and said that he had been "identified as being in Indio," defendant bowed his head and said, "I just can't handle it." Detective Collette testified that defendant said "he was sorry for what he had done, and he was sorry that he left [Swader's] girls without a father." Defendant started to cry after stating that Swader "got me off the streets and gave me a place to stay."

Defendant then gave detectives his version of the events. He said that he accompanied Swader on the trip to California and arrived at the Paramount Theater in Paramount at night. Swader went to the back of the van to sleep. About 2:30 a.m., defendant began thinking about using Swader's money to pay off a $13,000 debt he owed in Kansas. He took Swader's gun out of the console and shot Swader twice in the head while he was sleeping. Swader started "gurgling," and defendant got into the driver's seat and drove away. Defendant drove on the freeway and, by a bridge, he threw the gun out the window. Stopping at a park, defendant took Swader's wallet and $2,300 in cash, and left. He took a taxi to the Los Angeles airport and flew back to Tucson. Asked what he did with the money, defendant replied he "blew it all partying." Defendant said he "did it for the money. Money is the root of all evil."

Detective Collette asked defendant whether Wayne Anderson was involved. He was silent for 30 to 40 seconds, and then answered, "Yes." Defendant then said that "he and Wayne had a pact. The first one caught would take the rap." Defendant explained that "there was no point in the both of us frying over this." Defendant said that on September 3, he and Anderson talked about robbing Swader and dividing the money equally. Defendant said they decided to kill Swader "[b]ecause he was big, and he would kick their ass if they tried to rob him."

Explaining what happened, defendant said that he was in the driver's seat and that Anderson was in the passenger seat, and "all of a sudden, there was a boom, and it was over with. [Anderson] shot the victim twice in the head." Defendant admitted the idea to rob and kill Swader was both his and Anderson's; "they shared the idea 50-50."

When Detective Collette asked defendant if he wanted to have his statement tape-recorded, he said "he'd rather not." Defendant looked over the interview notes Detective Collette had taken. Defendant signed the last page, where he also wrote that the notes reflected an accurate account of his statement.

### 2. Defense Evidence

Defendant testified on his own behalf. On the day after Labor Day, defendant, Swader, and Anderson left Tucson for California. On the way, they stopped in Indio. Anderson was asleep and did not leave the van. They arrived in Paramount after dark. Around midnight, defendant went to the back of the trailer to sleep. Defendant woke up to a loud noise which sounded like a backfire from a car. He climbed out of the trailer to urinate. He then heard a second loud noise, which he thought was a gunshot. He believed the sound came from the van.

When defendant opened the driver's door, he saw Anderson standing over Swader and pulling at Swader's belt. Anderson turned around, pointed a gun at defendant, and told him to get in and drive. Defendant later said he did not actually see Anderson with a gun, but believed that Anderson was armed with one.

Defendant drove on the freeway, exited in Long Beach, and stopped in a park. Defendant and Anderson left the van and trailer, which defendant locked out of habit. Anderson started walking off and defendant followed him. Anderson stopped at a phone booth and called a taxi. Defendant and Anderson left in the taxi and went to the airport. Anderson paid for the taxi from "a big, old wad" of money. They flew to Phoenix, Arizona, bought a used van, and drove back to Tucson. A few days later, defendant, Anderson, and Cravens moved to Las Vegas.

Defendant was arrested in Las Vegas. During the four-hour police interview, defendant initially lied to Long Beach detectives about having no knowledge of Swader's death. Defendant told detectives he shot and robbed Swader because he owed $13,000, but later he said that Anderson did it and that the two of them had planned to kill Swader. Defendant said that his trial testimony, and not his statement to the police, was true. Defendant testified

that he did not plan with Anderson to rob or kill Swader, that he had no intention to kill Swader, and that he did not shoot Swader that night.

Defendant testified about his conversation with Donald Loar, also known as "David Grundy," defendant's cellmate in the Los Angeles County jail in 1987. Defendant and Loar discussed having a witness in Indio, i.e., Robert Berrie, "eliminated" because the witness could tie defendant and the victim together before the murder. However, defendant claimed he did not want that to actually happen. He only wanted to appear like a "heavy" to protect himself in jail. Defendant denied telling another inmate, Farrell Lee Torregano, that he personally shot Swader twice in the head.

Cravens testified that she and Anderson lived together and hung around the Tucson swap meet where they met defendant. During the 1984 Labor Day weekend, defendant and Anderson told Cravens they were going to work for Swader and accompany him to Los Angeles. Defendant and Anderson had gone with Swader to Los Angeles once before.

When they returned from the trip, Anderson and defendant were driving a green van, which Cravens had never seen before. Anderson gave Cravens a large amount of money to hold. A week after they returned from Los Angeles, defendant and Anderson, along with Cravens, moved to Las Vegas. In October 1984, Cravens received a call from defendant, who told her he had been arrested for vagrancy. After that call, Cravens and Anderson left Las Vegas and traveled to Oklahoma and Texas.

After defendant's arrest, Anderson told Cravens that "he hoped they didn't lay it too hard on [defendant] because he didn't deserve it because he did not pull the trigger, that [Anderson] himself had done it." He said, "I pulled the trigger." In an initial interview in 1993 with defense investigator Cynthia Castro, Cravens did not tell her what Anderson said or reveal his true name. However, in a subsequent telephone conversation she decided to tell Castro the truth—10 years after the events—because Cravens said Castro told her that Anderson would not find out that Cravens was the source of this information.

The parties stipulated that a print expert for the Long Beach Police Department lifted a fingerprint from a Pepsi soda can found in Swader's van, which matched the right ring finger of an individual named Harold Wayne Wilson, which was Anderson's real name. The parties also stipulated that the "age of the prints cannot be determined and that touching of items does not necessarily leave fingerprints."

### 3. *Prosecution Rebuttal Evidence*

Detective Collette testified that when he arrived at the crime scene, the two padlocks on Swader's trailer were locked and a bungee cord was secured across the trailer door.

Probation Officer Jack Pionke, who conducted an interview with defendant on July 8, 1988, testified that defendant denied killing Swader. Defendant told Pionke that he did not go with Swader on the September trip because he had food poisoning. Instead, he went "partying."

Defense investigator Cynthia Castro testified about her October 26, 1993, interview with Cravens. Castro testified that Cravens stated Anderson had "actually pulled the trigger" and that money was the reason for the murder. Castro said she did not say anything in order to urge her to come forward with this information. Castro did not assure Cravens that Anderson would not find out what Cravens said.

### B. *Penalty Phase*

### 1. *Prosecution Evidence*

The prosecution called Rose Wigley, the younger sister of victim Swader. She testified that she grew up with Swader in a small town in Alabama, and that he served in the military for 22 years. Swader had custody of his two young daughters, who were six and four years old when he died, after their mother had abandoned them. After Swader's death, Wigley obtained custody of the girls. Wigley testified that their father's death "devastated" the girls.

The prosecution presented the prior testimony of Donald Loar. At the first trial, Loar testified that defendant told him that he was in custody because he murdered his boss. Loar also testified that defendant, who believed Loar had "Mafia ties," asked Loar to get a hit man to eliminate a witness who was "a thorn in [defendant's] side, that could do him a lot of harm if he testified, that could put him and the murder victim together." Defendant told Loar "he should have taken the gas receipt."

Farrell Lee Torregano, an inmate who met defendant in the Los Angeles County jail, testified that defendant told him "he was working for a guy that was in Tucson that ran a swap meet, and they come to California to buy tools to go back up there and sell." Defendant asked the guy to borrow money but he refused. Torregano testified: "So when [defendant] got here in Long Beach, in King's Park, the guy was sleeping. He got the gun. He shot him twice in the head, took the money off the guy, left, and went to Tucson."

The parties stipulated that defendant suffered a 1983 prior conviction for felony theft in Kansas.

### 2. *Defense Evidence*

The defense called James Park, a consultant and former associate warden for the Department of Corrections. He testified that based on his review of defendant's prison file, he believed that if defendant received a life without possibility of parole sentence, defendant would "be [a] well above average prisoner." Park testified that based on defendant's "age and his background, his skills that he has, the other measures of stability, that stability in terms of prison adjustment, there is no doubt that he will be sought after by supervisors."

Defendant's then 23-year-old daughter, Vicki Howell, also testified. She said that she and her sister Valerie did not have many memories of defendant because her mother "didn't want us to have any relationship" with defendant. However, two years prior to the trial, after their mother stopped "interfering," Howell began communicating with defendant through letters and phone calls, and their relationship became closer. She thought that defendant was a positive influence on her and believed that he tried to fulfill his role as a father.

Deeanna Owen, who first met defendant in Kansas in 1979, testified she considered defendant a "close and valued friend." Before defendant got in trouble, Owen never knew him to be violent in any way. Owen recalled one time when defendant broke up a fight at a bar.

Reverend Lynn Schubert, a jail chaplain, testified that he met defendant at the Hall of Justice. After defendant was incarcerated in San Quentin, he would often write or call Reverend Schubert. Reverend Schubert testified: "Of all of the men that we've come in contact with, he's been the most faithful of any of them, and he's very sincere. I believe that with my heart, that he really wants God to make something of his life." He considered defendant a friend.

Dr. Michael Maloney, a forensic psychologist, testified he first met defendant in 1985 to administer psychological tests. Dr. Maloney interviewed defendant's adoptive father and reviewed defendant's "life chronology" documents. Defendant's biological mother was "fairly consistently described as having an alcohol abuse problem and being neglectful of him, and I think that's what led to the adoption." Defendant's adoptive parents, especially his adoptive mother, also had alcohol problems. Defendant, at age 13, was placed in a psychiatric hospital for "bizarre behavior." As a teenager, he was hospitalized three different times in psychiatric facilities, until he was emancipated at age 18.

Dr. Maloney testified that defendant was given an electroencephalogram (EEG) twice in his childhood. Both times the EEG results were abnormal, indicating a "mild organic brain dysfunction or brain damage." Dr. Maloney believed defendant displayed psychological symptoms consistent with fetal alcohol syndrome. Defendant also displayed learning disabilities when he was in school.

In 1985, Dr. Maloney gave defendant a number of tests to determine if he suffered from any possible organic brain syndrome. In the verbal areas, Dr. Maloney believed defendant's "intelligence is probably bright average, above average." There was no evidence that defendant suffered from a psychotic mental illness. But there was evidence of defendant's "personality disorder with features of underlying hostility and anger and difficulty adjusting."

When Dr. Maloney reinterviewed defendant in 1993, he "did not notice anything remarkably different." The results of the Minnesota Multiphasic Personality Inventory (MMPI) test on defendant did not suggest a specific diagnosis. Dr. Maloney believed it was "clear" there was no "major mental disturbance such as psychosis." He also thought that defendant would not be a "high risk" for violence in a custody situation.

## II. DISCUSSION

### A. *Pretrial Issue—Excusal of a Juror*

■ Defendant contends that the trial court improperly excused one prospective juror, Rachel F., because of her views on the death penalty. In determining whether to excuse a juror based on her views regarding the death penalty, a trial court must determine whether the juror's views would " 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " (*Wainwright v. Witt* (1985) 469 U.S. 412, 424 [83 L.Ed.2d 841, 105 S.Ct. 844]; see *People v. Griffin* (2004) 33 Cal.4th 536, 558 [15 Cal.Rptr.3d 743, 93 P.3d 344].) "Substantial evidence is the standard of review applicable to a finding on the potential effect of a prospective juror's views related to capital punishment. [Citations.]" (*People v. Griffin, supra,* 33 Cal.4th at p. 558.) The same standard applies for determining the nature of such views. (*Ibid.*) We conclude substantial evidence supports the trial court's finding that the prospective juror's views against the death penalty prevented or substantially impaired her ability to perform her duties.

During voir dire, the trial court excused Rachel F. for cause. On her juror questionnaire, Rachel F. originally answered "no," but changed her answer to "yes," to the question whether she would "always vote against death, no

matter what evidence might be presented or argument made during a penalty trial." When the trial court questioned her about her changed response, it asked whether she had a conscientious objection to the death penalty such that she "would automatically and absolutely refuse to consider or vote for a verdict of death in a case involving these charges and special circumstance." Rachel F. answered, "I would not be able to consider the death penalty."

When defense counsel also asked her, "Can you conjure up a set of facts in your mind that you can consider that [death] would be an appropriate penalty," Rachel F. responded, "No, I can't conjure that up." The court also asked, "And so under no circumstances would you ever consider voting for the death penalty?" She replied, "I don't think I could send somebody to his death. Ever." Contrary to defendant's contention, the fact that Rachel F. qualified her answers with "I think," does not undercut the trial court's finding that she was substantially impaired from performing her duties. (*People v. Mitcham* (1992) 1 Cal.4th 1027, 1062 [5 Cal.Rptr.2d 230, 824 P.2d 1277].)

■ Also, the trial court was not required to determine whether the prospective juror might be able to consider the death penalty under different circumstances. "The impact the juror's views might have in actual or hypothetical cases that are not before the juror [is] irrelevant" to the determination whether the juror's ability to return the death penalty was impaired. (*People v. Visciotti* (1992) 2 Cal.4th 1, 45, fn. 16 [5 Cal.Rptr.2d 495, 825 P.2d 388].)

## B. *Guilt Phase Issues*

As a preliminary matter, throughout his briefs defendant contends that transcripts of conferences between the trial court and counsel, which included discussions on jury instructions at both the guilt and penalty phases, are missing. He argues these missing transcripts "prejudiced [his] ability to prosecute his appeal because comments, discussions, and (possibly) rulings regarding improper and inadequate instructions are missing."

■ "An incomplete record is a violation of section 190.9, which requires that all proceedings in a capital case be conducted on the record with a reporter present and transcriptions prepared. [Citation.]" (*People v. Frye* (1998) 18 Cal.4th 894, 941 [77 Cal.Rptr.2d 25, 959 P.2d 183].) Notwithstanding section 190.9's mandatory requirement, "[n]o presumption of prejudice arises from the absence of materials from the appellate record [citation], and defendant bears the burden of demonstrating that the record is inadequate to permit meaningful appellate review [citations]." (*People v. Samayoa* (1997) 15 Cal.4th 795, 820 [64 Cal.Rptr.2d 400, 938 P.2d 2].)

Defendant maintains the appellate record in this case does not include the February 24, 1994, conference regarding jury instructions; the March 1, 1994, instructional conference at which the parties discussed CALJIC No. 2.50 and other guilt phase instructions; a discussion on the preliminary ruling on the Loar transcript; a discussion of the victim impact evidence and other penalty phase evidence; and a discussion regarding the penalty phase instructions.

Even assuming such transcripts are missing, we conclude that they do not preclude adequate review of the issues. As will be seen, to the extent the missing transcripts bear on his claims of instructional error, we will give defendant the benefit of the doubt as to the substance of these missing transcripts. (*People v. Young* (2005) 34 Cal.4th 1149, 1203, 1225 [24 Cal.Rptr.3d 112, 105 P.3d 487].) As such, we reject his claim that the record is inadequate to permit meaningful review. (*Id.* at p. 1170.)

### 1. *CALJIC No. 2.50*

The trial court instructed the jury with CALJIC No. 2.50, permitting jurors to consider evidence of defendant's other crimes for the limited purpose of proving the identity of the perpetrator. The trial court also gave corresponding instructions regarding the burden of proof on other crimes evidence, and the definition of preponderance of the evidence. (CALJIC Nos. 2.50.1, 2.50.2.) As defendant points out, it is unclear who requested CALJIC No. 2.50 because the instructional conference is not included in the appellate record.

As given, CALJIC No. 2.50 provided as follows: "Evidence has been introduced for the purpose of showing that the defendant committed a crime other than for which he is on trial. [¶] Such evidence, if believed, was not received and may not be considered by you to prove that defendant is a person of bad character or that he has a disposition to commit crimes. [¶] Such evidence was received and may be considered by you only for the limited purpose of determining if it tends to show: [¶] The identity of the person who committed the crime, if any, of which the defendant is accused. [¶] For the limited purpose for which you may consider such evidence, you must weigh it in the same manner as you do all other evidence in the case. [¶] You are not permitted to consider such evidence for any other purpose."

Defendant asserts the instruction "invited" the jury to use his prior conviction for grand theft, his marijuana use, and a jailhouse solicitation of murder as evidence of other crimes, as propensity evidence. This evidence was adduced through defendant's testimony in the guilt phase; the prosecution did not introduce any specific uncharged criminal conduct during its case-in-chief. On direct examination, defendant admitted a prior conviction for grand theft in Kansas, and conceded he violated a condition of probation

for the conviction by leaving that state. The parties did not discuss the details underlying this conviction. Also, defendant revealed he and Wayne Anderson smoked "a joint" on the evening of the Swader murder, and that they were smoking "a lot" of marijuana during those days.

Regarding the solicitation for murder, defendant on direct and cross-examination testified to his 1987 conversation with Donald Loar while both were incarcerated in the Los Angeles County jail. Though not denying he talked to Loar about eliminating prosecution witness Robert Berrie, defendant maintained that it was Loar who offered to eliminate Berrie, that defendant "never wanted it to happen," and that he simply wanted to appear like a "heavy" to protect himself in jail.

On appeal, defendant does not contend the trial court or the prosecution highlighted this other crimes evidence to the jury. Indeed, the record shows the trial court confirmed that both defense counsel and the prosecution "agree[d] that there is no need to define the crime referred to in CALJIC 2.50." Claiming error, defendant asserts the instruction failed to identify the other crimes evidence and failed to provide the jury with sufficient guidance, and that there was insufficient evidence to support giving the instruction. He argues that giving this instruction violated his various constitutional rights. For reasons that follow, we find no error.

As noted above, defense counsel agreed it was unnecessary to define the other crimes evidence. Thus, defendant has forfeited this claim on appeal. (*People v. Lewis* (2001) 25 Cal.4th 610, 638 [106 Cal.Rptr.2d 629, 22 P.3d 392].) In any event, we fail to see how identifying the other crimes evidence with respect to CALJIC No. 2.50 would have benefited defendant here. Delineating the other crimes might have caused the jury to focus on the crimes, and a defendant may want to avoid any such focus. (See *People v. Phillips* (1985) 41 Cal.3d 29, 73, fn. 25 [222 Cal.Rptr. 127, 711 P.2d 423] ["tactical considerations" to avoid defining elements of other crimes at penalty phase; "such instructions could result in the jury placing undue significance on such other crimes rather than on the central question of whether he should live or die"].) Moreover, although it is unclear who requested the instruction, CALJIC No. 2.50 as given was arguably beneficial to defendant—it instructed the jury *not* to consider defendant's other crimes for a variety of purposes (i.e., to prove that defendant "is a person of bad character or that he has a disposition to commit crimes"), while limiting the jury's use of the evidence solely to decide the issue of identity. Based on the foregoing, we conclude that defendant suffered no prejudice from the failure to define the other crimes evidence.

Defendant also argues that because CALJIC No. 2.50 was "silent as to how the unspecified evidence might be used to show identity other than by

showing predisposition or bad character, it is both confusing and contradictory." We disagree. Contrary to defendant's suggestion, CALJIC No. 2.50 "was and is a correct statement of the law." (*People v. Linkenauger* (1995) 32 Cal.App.4th 1603, 1615 [38 Cal.Rptr.2d 868]; see Evid. Code, § 1101, subd. (b) [evidence of crime admissible to prove identity].)

As we discussed in the first appeal, defendant's act of soliciting the murder of key prosecution witness Berrie "was highly probative of defendant's consciousness of guilt, which in turn was probative of his identity as the perpetrator of the charged offenses." (*People v. Wilson, supra,* 3 Cal.4th at p. 940, citing *People v. Edelbacher* (1989) 47 Cal.3d 983, 1006–1007 [254 Cal.Rptr. 586, 766 P.2d 1].) Here, CALJIC No. 2.50 limited the jury's use of the other crimes evidence to the issue of identity and emphasized that the jury was "not permitted to consider such evidence for any other purpose." We conclude that the evidence of solicitation here was "so highly relevant to the central issue, . . . that there was little, if any, danger that the jury would consider such evidence for any of the improper purposes proposed by defendant, including general criminal disposition." (*People v. Bunyard* (1988) 45 Cal.3d 1189, 1226 [249 Cal.Rptr. 71, 756 P.2d 795].)

As noted above, neither the trial court nor the prosecution suggested that defendant committed the crime of solicitation of murder. The court's instruction did not mention any particular crime. In any event, contrary to defendant's contention, there was sufficient evidence that defendant committed the offense of soliciting Berrie's murder.

■ "Solicitation is defined as an offer or invitation to another to commit a crime, with the intent that the crime be committed. The crime of solicitation, which is restricted to the solicitation of particular serious felony offenses, is complete once the verbal request is made with the requisite criminal intent; the harm is in asking, and it is punishable irrespective of the reaction of the person solicited. Thus, solicitation does not require the defendant to undertake any direct, unequivocal act towards committing the target crime; it is completed by the solicitation itself, whether or not the object of the solicitation is ever achieved, any steps are even taken towards accomplishing it, or the person solicited immediately rejects it. [Citations.]" (*In re Ryan N.* (2001) 92 Cal.App.4th 1359, 1377–1378 [112 Cal.Rptr.2d 620]; see § 653f, subd. (b) [soliciting commission of murder]; see also, e.g., *People v. Gordon* (1975) 47 Cal.App.3d 465, 472 [120 Cal.Rptr. 840] ["The intent may be inferred from the circumstances of the asking"].)

Although defendant maintains he only wanted to appear like a "heavy" and did not actually want to kill Berrie, a trier of fact could reasonably have concluded otherwise in light of the circumstances. Believing that Loar had

connections to make a hit, defendant testified that he told Loar that he wanted to eliminate Berrie, a key witness who could place defendant and the victim together before the murder. A trier of fact could have reasonably rejected portions of defendant's self-serving testimony that he did not want to kill Berrie and that it was Loar who offered to eliminate Berrie. Accordingly, we conclude the trial court did not err in giving CALJIC No. 2.50.

In a related argument, defendant claims that there was insufficient evidence of criminal solicitation (§ 653f) because the evidence consisted only of defendant's testimony without corroborating circumstances. Under section 653f, subdivision (f), the "offense *charged* . . . shall be proven by the testimony of two witnesses, or of one witness and corroborating circumstances." (Italics added.) As the Attorney General argues, the evidentiary requirement under section 653f, subdivision (f), is inapplicable here. (*People v. McDermott* (2002) 28 Cal.4th 946, 1000 [123 Cal.Rptr.2d 654, 51 P.3d 874] [§ 653f, subd. (f)'s proof requirement not applicable if evidence is not used to "prove a violation of section 653f"].) The offense of solicitation was not charged, and evidence of such would have gone solely to prove identity of the perpetrator. (Evid. Code, § 1101; CALJIC No. 2.50.)

Finally, contrary to defendant's suggestion, there is no reasonable likelihood that, in addition to considering defendant's prior grand theft conviction for impeachment purposes (CALJIC No. 2.23), the jury used the conviction to prove identity under CALJIC No. 2.50. (*People v. Farnam* (2002) 28 Cal.4th 107, 173 [121 Cal.Rptr.2d 106, 47 P.3d 988] [challenged "matters were properly admitted and involved little, if any, potential for improper use by the jury"]; see *People v. Catlin* (2001) 26 Cal.4th 81, 147 [109 Cal.Rptr.2d 31, 26 P.3d 357] [assuming *Chapman* standard applied, no "reasonable possibility" jury considered prior forgery conviction admitted for impeachment purposes for CALJIC No. 2.50].) There is also no reasonable likelihood that the jury considered defendant's marijuana use for an improper purpose. (*People v. Farnam, supra*, 28 Cal.4th at p. 173.) Defendant's two references to smoking a joint with Wayne Anderson on the night of the murder were brief, and neither the prosecution nor defense mentioned defendant's marijuana use during closing argument.

Based on the foregoing, we find no error based on CALJIC No. 2.50.[5]

---

[5] "With regard both to this claim and to every other claim raised in his brief, defendant asserts that each alleged error violates not only state law but multiple provisions of the federal and California Constitutions. In addressing each claim discussed in this opinion, we have considered defendant's contention that the alleged error violates the federal and California Constitutions, and our rejection of each claim of reversible error includes a determination that the alleged error does not warrant reversal under the state or federal Constitution." (*People v. Slaughter* (2002) 27 Cal.4th 1187, 1199, fn. 2 [120 Cal.Rptr.2d 477, 47 P.3d 262].)

### 2. CALJIC No. 2.06

Defendant argues that the trial court erred by instructing the jury with CALJIC No. 2.06 regarding the suppression of evidence. The instruction provided as follows: "If you find that a defendant attempted to suppress evidence against him in any manner, such as by the intimidation of a witness or by destroying evidence, such attempt may be considered by you as a circumstance tending to show a consciousness of guilt. However, such conduct is not sufficient by itself to prove guilt, and its weight and significance, if any, are matters for your consideration."

Because the March 1, 1994, instructional conference is not part of the record, defendant argues that "the intentions behind the court's modifications to and giving of CALJIC 2.06 are unknown." Both defendant and the Attorney General, however, agree the conduct CALJIC No. 2.06 referred to was defendant's solicitation of murder of prosecution witness Berrie, and of defendant's throwing away the gun used to shoot victim Swader.

Defendant maintains this instruction improperly lessened the prosecution's burden of proof and was unsupported by the evidence. Based on this alleged error, he claims various constitutional violations. For reasons that follow, we find no error.

We have consistently rejected the claim that CALJIC No. 2.06 lessens the prosecution's burden of proof. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 103 [17 Cal.Rptr.3d 710, 96 P.3d 30]; *People v. Jackson* (1996) 13 Cal.4th 1164, 1223–1224 [56 Cal.Rptr.2d 49, 920 P.2d 1254].) We also find sufficient evidence to support the instruction.

■ " '[I]n order for a jury to be instructed that it can infer a consciousness of guilt from suppression of adverse evidence by a defendant, there must be some evidence in the record which, if believed by the jury, will sufficiently support the suggested inference.' [Citation.]" (*People v. Hart* (1999) 20 Cal.4th 546, 620 [85 Cal.Rptr.2d 132, 976 P.2d 683].) As discussed above, there was evidence from which the jury could infer that defendant solicited Berrie's murder. (See *ante*, at pp. 328–329.) This evidence suffices for purposes of CALJIC No. 2.06. (*People v. Williams* (1997) 16 Cal.4th 153, 200–201 [66 Cal.Rptr.2d 123, 940 P.2d 710] [evidence that the defendant authorized a third party to suppress a witness's testimony is admissible pursuant to CALJIC No. 2.06].)

There was also evidence defendant attempted to destroy the murder weapon. In his confession to the police, defendant stated that after he shot Swader with his own gun, defendant threw the gun out the car window as he drove on the freeway.

### 3. *Failure to Instruct on the Defense of Duress*

Defendant argues that the trial court erred by failing to instruct the jury sua sponte on the defense of duress. (See § 26; CALJIC No. 4.40.) He contends there was substantial evidence that he acted out of fear that Anderson, whom defendant maintained committed the criminal acts, would kill him. Specifically, defendant testified that he heard two gunshots, that he saw Anderson standing over Swader's body holding a gun, that Anderson pointed the gun at defendant and told him to drive, and that defendant "figure[d] he was going to kill me, too." Defendant asserts that he simply interrupted, then aided, a robbery that was in progress.

■ The defense of duress is available to defendants who commit crimes, except murder, "under threats or menaces sufficient to show that they had reasonable cause to and did believe their lives would be endangered if they refused." (§ 26; see *People v. Anderson* (2002) 28 Cal.4th 767, 780 [122 Cal.Rptr.2d 587, 50 P.3d 368].) Although "duress is not a defense to any form of murder," (*People v. Anderson, supra,* 28 Cal.4th at p. 780) "duress can, in effect, provide a defense to murder on a felony-murder theory by negating the underlying felony. [Citations.] If one is not guilty of the underlying felony due to duress, one cannot be guilty of felony murder based on that felony." (*Id.* at p. 784.) A trial court is required to instruct sua sponte on a duress defense if there is substantial evidence of the defense and if it is not inconsistent with the defendant's theory of the case. (See *People v. Breverman* (1998) 19 Cal.4th 142, 157 [77 Cal.Rptr.2d 870, 960 P.2d 1094].)

Defendant claims there was substantial evidence of duress as a defense to the robbery charge (§ 211), the underlying offense of felony murder, and the robbery-murder special-circumstance allegation (§ 190.2, subd. (a)(17)(A)). The trial court here instructed the jury as to both deliberate and premeditated first degree murder (CALJIC No. 8.20), and first degree felony murder (CALJIC No. 8.21). Because it is unclear whether the jury relied on the premeditation theory or the felony-murder theory, defendant argues we must reverse the murder conviction, in addition to the penalty judgment and the robbery conviction.

■ We conclude the trial court did not err in failing to give the duress instruction because defendant failed to present substantial evidence of the defense. "Substantial evidence is 'evidence sufficient "to deserve consideration by the jury," not "whenever *any* evidence is presented, no matter how weak." ' " (*People v. Lewis* (2001) 26 Cal.4th 334, 369 [110 Cal.Rptr.2d 272, 28 P.3d 34], quoting *People v. Williams* (1992) 4 Cal.4th 354, 361 [14 Cal.Rptr.2d 441, 841 P.2d 961].) Although defendant testified Anderson pointed a gun at him and told him to drive, defendant conceded that he did

not actually see Anderson with a gun. Moreover, in his pretrial statement, defendant admitted to detectives that he and Anderson planned Swader's robbery and murder, that he and Anderson shared the idea to commit these crimes "50-50," and that he had the motive to rob Swader in order to pay off a $13,000 debt.

In any event, any error based on the failure to instruct on duress was harmless. The jury clearly rejected defendant's theory that he had no involvement in the murder and that he aided the robbery only *after* Anderson had already shot and killed Swader. As the trial court instructed the jury, the robbery-murder special-circumstance allegation required the jury to find that "defendant acted with specific intent to kill" and that the "murder was committed while [defendant] was engaged in the commission of a robbery." By finding this special circumstance allegation to be true, the jury necessarily rejected any factual basis underlying defendant's duress defense. (See *People v. Pulido* (1997) 15 Cal.4th 713, 726–727 [63 Cal.Rptr.2d 625, 936 P.2d 1235] [true finding on robbery-murder special circumstance shows jury rejected the defendant's theory that he was involved in the robbery only after the killing].) Moreover, the jury found that defendant personally used a handgun in the commission of the murder and robbery. (§ 12022.5, subd. (a).) This finding also shows the jury rejected defendant's testimony that his involvement in the crimes was minor and that Anderson was the armed robber and actual killer.

### 4. *Alleged Prosecutorial Misconduct*

Defendant contends the prosecution committed multiple acts of misconduct during the guilt phase. We discuss each claim in turn.

#### a. *Discovery violations*

During her direct examination, defense witness Sonya Cravens testified that Wayne Anderson told her that he, and not defendant, shot Swader. Cravens said Anderson told her: "I hope they don't get [defendant] too hard. He doesn't deserve it because I pulled the trigger." The prosecution objected on hearsay grounds and contended the statement did not fall within the hearsay exception of declaration against interest (Evid. Code, § 1230). Noting it was a "close call," the trial court ruled that "subject to a showing of unavailability," the statement "does meet the criteria set forth in Evidence Code section 1230 and is admissible."

The trial court held a hearing to determine the availability of Anderson. Defendant called investigator Cynthia Castro, who testified she traveled to Kansas and Oklahoma to try to locate Anderson. Castro subsequently discovered that Anderson used various aliases. Although Castro traveled to

Oklahoma and spoke with Cravens, Castro was unable to find Anderson. To show that defendant did not use due diligence, the prosecution called Detective Collette to testify about his own efforts to locate Anderson. Detective Collette testified that in December 1993, he searched for Anderson through a driver's license check in Oklahoma. Detective Collette stated that he located Anderson, who was living under the name Richard Dume, in Grove, Oklahoma. Defense counsel responded he was "totally shocked" that the prosecution did not give them any investigative reports on the search in Oklahoma, despite previously representing that "everything the People have had has long since been turned over."

Defendant maintains that investigating officers had "an ongoing secretive inquiry into the whereabouts" of Anderson. On appeal, defendant claims that the prosecution's failure to disclose information about Anderson violated sections 1054.1, 1054.7 and 190.3, along with constitutional provisions. For reasons that follow, we disagree.

Significantly, defendant fails to show any conceivable prejudice based on any alleged discovery violation. The trial court ultimately found that defendant used due diligence to try to locate Anderson, and as such, determined Anderson was "unavailable." (Evid. Code, § 1230.) Accordingly, it permitted the defense to call Cravens as a witness to testify about Anderson's self-inculpatory statements that he, and not defendant, shot Swader. Indeed, as the prosecution pointed out, it was to defendant's advantage that he not locate Anderson, because then Anderson's self-inculpatory statements would come in through Cravens's undisputed testimony.

Moreover, the prosecution did not commit misconduct. Defendant fails to show how the prosecution violated section 1054.1's discovery obligations by not disclosing information on a witness the defense intended to present. Also, given that Detective Collette used reports provided by the *defense* to direct his search to Oklahoma, defendant's claim that he could not find Anderson without information from Detective Collette's investigation is meritless. Finally, we agree with the Attorney General that Detective Collette's search efforts did not constitute "evidence favorable to an accused" within the meaning of *Brady v. Maryland* (1963) 373 U.S. 83, 87 [10 L.Ed.2d 215, 83 S.Ct. 1194].

### b. *Inconsistent theories*

Defendant claims the prosecution committed misconduct by arguing inconsistent theories. At a hearing outside the presence of the jury to determine the admissibility of Wayne Anderson's self-inculpatory statements (Evid. Code § 402), Detective Collette testified to his attempt to find Anderson. The prosecution stated that from "Detective Collette's perspective, [Wayne

Anderson] is, as is Sonya Cravens from the evidence we have, a suspect in this case." However, at the conclusion of the guilt phase, the prosecution told the jury: "Let's bear in mind that Wayne and Sonya, when this case was initiated and, as far as I know, to this point are not suspects in the murder." Based on these statements, defendant asserts that the prosecution "manipulat[ed]" the theory of its case. We disagree.

First, defendant failed to object on this ground at trial; therefore, he has forfeited this claim on appeal. (*People v. Farnam, supra,* 28 Cal.4th at p. 167.) Second, this claim lacks merit. The prosecution's statement that Detective Collette believed Anderson was a "suspect in the case" simply challenged why the defense made no genuine attempt to locate this material witness. Even assuming this statement, *which was made outside the presence of the jury,* contradicted the prosecution's closing argument that Anderson was not a suspect "in the murder," the prosecution did not pursue inconsistent theories of its case. (Cf. *In re Sakarias* (2005) 35 Cal.4th 140, 171 [25 Cal.Rptr.3d 265, 106 P.3d 931] [death judgment vacated where prosecution inconsistently argued in two trials that two defendants inflicted the same fatal blows].)

### c. *Cross-examination of Sonya Cravens*

During its cross-examination of Sonya Cravens, the prosecution asked her, "Did you not inquire of *your attorney* whether or not you had to speak to [Detective Collette and his partner]?" Defense counsel objected that he was not Cravens's attorney: "I represent Mr. Wilson." The prosecution apologized and rephrased its question. On appeal, defendant claims that the prosecution's question "improperly hinted that Cravens was part and parcel of the defense team." We disagree. The prosecution's brief misstatement, which was quickly withdrawn, did not improperly suggest Cravens was part of the defense team, much less constitute a deceptive or reprehensible method used to persuade the jury. (See *People v. Monterroso* (2005) 34 Cal.4th 743, 785 [22 Cal.Rptr.3d 1, 101 P.3d 956].)

Defendant also claims that the prosecution attempted to intimidate Cravens by "affirmatively exploiting her fears of reprisal from Wayne" through personal questions on her address and the cars she had, and by asking her "sharp, argumentative, and even threatening" questions. We disagree.

First, defendant failed to object that the questions were argumentative; therefore, he has forfeited this claim on appeal. (*People v. Farnam, supra,* 28 Cal.4th at p. 167.) Second, the prosecution's cross-examination was proper. Cravens testified that Anderson told her that defendant did not murder Swader, but that he himself had "pulled the trigger." However, she came forward with this information almost 10 years later because she said the

defense investigator reassured her that Anderson "would not find out that I was the one who gave the information, and I was tired of hiding it." In light of her decade-long silence, the prosecution was entitled to ask her pointed questions on her credibility and her change of heart. The prosecution's question whether she knew that this was a public trial and that anybody could attend was not intended to frighten Cravens, but sought to undermine her assertion that she only came forward now because she would not have to worry about Anderson coming after her.

Also, the prosecution's questions on her current home address and the year, make, and license plate numbers of her cars were intended to contradict her testimony that she did not know that Detective Collette had knocked on her door in February 1994. The trial court overruled defendant's relevance objection after the prosecution explained it would tie the information to Detective Collette's visit to Cravens's home.

### d. *Cross-examination of defendant*

Defendant argues the prosecution committed misconduct by suggesting that defendant's exercise of the right of counsel was somehow improper and showed his consciousness of guilt. For example, the prosecution pointed out that defendant knew the police could not talk to him once he was represented by counsel, that defendant has read all the reports in this case, and that defendant has had a number of attorneys over the years. Because defendant did not object on this ground at trial, he has forfeited the claim on appeal. (*People v. Farnam, supra,* 28 Cal.4th at p. 167.)

Moreover, contrary to defendant's assertion, this cross-examination was not improper. "A prosecutor is permitted wide scope in the cross-examination of a criminal defendant who elects to take the stand. [Citation.]" (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1147 [124 Cal.Rptr.2d 373, 52 P.3d 572].) The prosecution here did not suggest that defendant's discussions with counsel or his review of discovery material were "nefarious." Instead, the prosecution's questions sought to undermine defendant's trial testimony denying liability for the murder, which differed from defendant's inculpatory statements to the police. The Attorney General argues the prosecution properly wanted to show that defendant had an opportunity to conform and falsify his trial testimony given his knowledge of the law. We agree with the Attorney General that the prosecution's questions were within the wide scope of permissible cross-examination. (See *ibid.*)

Also, by asking defendant whether he "remembered anything else" after speaking to his attorney, the prosecution did not commit misconduct. Given defendant's inconsistent testimony regarding whether he and Anderson had

discussions after fleeing the murder scene, the prosecution was entitled to question his ability to recall the events.

Nor did the prosecution invade privileged attorney-client communications. The prosecution pointed out that defendant told his prior attorneys at least four different versions of what happened. In its questioning, the prosecution also noted that defendant had "been advised by your attorneys of what was going to happen when you came into court," that he "had a chance over all these years, particularly the last six, to prepare and anticipate that," and that he "certainly talked to your present attorneys about this case at length."

■ Defendant failed to object based on attorney-client privilege, and as such, he has forfeited this claim on appeal. (Evid. Code, § 912, subd. (a) ["Consent to disclosure is manifested by . . . failure to claim the privilege in any proceeding in which the holder has the legal standing and opportunity to claim the privilege"].) Moreover, because defendant testified previously at the 1988 proceedings to these communications with counsel, he has waived the privilege. The attorney-client privilege "is waived with respect to a communication protected by the privilege if any holder of the privilege, without coercion, has disclosed a significant part of the communication . . . ." (*Ibid.*; see *People v. Barnett* (1998) 17 Cal.4th 1044, 1124 [74 Cal.Rptr.2d 121, 954 P.2d 384].)

Contrary to defendant's contention, *People v. Flores* (1977) 71 Cal.App.3d 559 [139 Cal.Rptr. 546], does not help him. In *People v. Flores*, the Court of Appeal concluded the trial court had a duty to inform the witness of his right to assert the attorney-client privilege because, unlike the situation here, the witness was "without advice of counsel and uninformed." (*Id.* at p. 564.)

e. *Guilt phase argument*

Defendant claims that the prosecution made a number of improper statements during closing argument at the guilt phase. The prosecution made an oblique reference to the first trial: "We know there have been other court proceedings. Obviously we're not telling you about those for a reason. You're not going to know about those." According to defendant, the prosecution also improperly referred to other criminal trials, like the Menendez brothers' trial, by stating, "In terms of that suggested lesser offense of accessory, actually I would find that humorous were it not for some of the things that we've all read about in the paper lately about the things that other juries have done."

Defendant also protests that the prosecution misleadingly told the jury that they would have heard evidence that Wayne Anderson was a "dangerous person" or threatened Sonya Cravens or defendant if there was any such

evidence, because defendant points out there was evidence—which the jury did not hear—that Anderson shot his cousin in 1985. He also claims the prosecution attempted to appeal to the jury's sympathy by stating "what little we hear about the victim is brushed under, swept under the rug." Defendant complains the prosecution questioned the integrity of defense counsel and witnesses by stating defendant was "missing his lines there" during his testimony, and that the defense had a "strategy" and used Cravens's testimony as a "calculated" attempt to "serve the interests of the defense as best as possible." Finally, defendant asserts the prosecution "sandbagg[ed]" the defense and engaged in "gamesmanship" by not revealing its theory of its case until after defense closing argument, thus precluding the defense from responding. Defendant failed to object to any of these comments; as such, he has forfeited the claim on appeal.[6] (*People v. Farnam, supra,* 28 Cal.4th at p. 167.) Moreover, for reasons that follow, we conclude none of the prosecution's comments constituted misconduct.

■ "To prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner." (*People v. Frye, supra,* 18 Cal.4th at p. 970.) "Prosecutors have wide latitude to discuss and draw inferences from the evidence at trial. [Citation.] Whether the inferences the prosecutor draws are reasonable is for the jury to decide. [Citation.]" (*People v. Dennis* (1998) 17 Cal.4th 468, 522 [71 Cal.Rptr.2d 680, 950 P.2d 1035].) In order to preserve an appellate claim of prosecutorial misconduct, a defendant must make a timely objection at trial and request an admonition; otherwise, a claim is reviewable only if an admonition would not have cured the harm caused by the misconduct. (*People v. Farnam, supra,* 28 Cal.4th at p. 167.)

We conclude the prosecution's reference to the first trial was fair comment on the evidence in that defendant himself testified he had prior attorneys.

---

[6] Defendant points out that the trial court made the following comment before closing argument at both the guilt and penalty phases: "I'm going to ask the lawyers to try and avoid interrupting one another during the argument, and if either attorney should misstate the evidence or the law, and I know that neither would do that intentionally, you are to rely on the evidence as it was presented in the trial and the law as I will be giving it to you." Defendant claims that given this admonition, his counsel's failure to object at all during closing argument at the guilt and penalty phases was understandable and excusable. We disagree.

Contrary to defendant's contention, the trial court did not prohibit counsel from raising objections or asking for admonitions, but requested that they "try and avoid" interruptions. The trial court mainly emphasized that the jury should ultimately rely on the court's instructions on the evidence and the law. We conclude that because the atmosphere of the trial was "not poisonous" (*People v. Hillhouse* (2002) 27 Cal.4th 469, 502 [117 Cal.Rptr.2d 45, 40 P.3d 754]), defendant failed to object at all (even after the arguments), and the record fails to show that objections would have been futile, the normal rule requiring an objection to preserve a claim on appeal applies. (*Ibid.* ["extreme circumstances" may justify an "unusual" rule].)

Although defendant claims the prosecution invited jurors to speculate on the reason why they were not told about the first trial, "we 'do not lightly infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements. [Citation.]" (*People v. Frye, supra,* 18 Cal.4th at p. 970.) Also, not only does the record not disclose that the prosecution was referring to the Menendez trial when it referred to "things other juries have done," it is unclear how this reference constituted misconduct. The prosecution made this brief comment in the context of urging the jury not to find defendant guilty of the lesser offense of being an accessory.

 Contrary to defendant's contention, we disagree that the prosecution "improperly exploited" the "suppression" of evidence that Anderson shot someone. Defense counsel himself told the trial court that he "did not intend for that information to come before the jury, recognizing the hearsay nature of it." Moreover, the prosecution's argument was fair comment on the evidence. Given defendant's argument he committed the crimes out of fear that Anderson would kill him, it was reasonable for the prosecution to point out that defendant did not present any evidence that Anderson threatened defendant or Cravens. "[P]rosecutorial comment upon a defendant's failure 'to introduce material evidence or to call logical witnesses' is not improper. [Citations.]" (*People v. Wash* (1993) 6 Cal.4th 215, 263 [24 Cal.Rptr.2d 421, 861 P.2d 1107].)

 The prosecution's statement that victim Swader was being "swept under the rug" was also fair comment on the evidence. The jury heard that Swader had given defendant a job and a place to stay, and that defendant had taken advantage of Swader's generosity and trust. "A prosecutor may properly identify the traits that made the victim vulnerable to attack when such characteristics are relevant to the charged crimes, and has no obligation 'to shield the jury from all favorable inferences about the victim's life or to describe relevant events in artificially drab or clinical terms.' [Citation.]" (*People v. Frye, supra,* 18 Cal.4th at p. 975.)

 Moreover, the prosecution's assertion that defendant was lying and its description of the defense strategy were not misconduct. The prosecution may properly refer to a defendant as a "liar" if it is a "reasonable inference based on the evidence. [Citation.]" (*People v. Coddington* (2000) 23 Cal.4th 529, 613 [97 Cal.Rptr.2d 528, 2 P.3d 1081].) Defendant testified he gave numerous different accounts of the events. Nor was the prosecution's description of Cravens's "calculated" testimony improper. The "prosecutor is entitled to comment on the credibility of witnesses based on the evidence adduced at trial." (*People v. Thomas* (1992) 2 Cal.4th 489, 529 [7 Cal.Rptr.2d 199, 828 P.2d 101].) Also, defendant's claim that the prosecution maligned the integrity of defense counsel is meritless. " 'To

observe that an experienced defense counsel will attempt to "twist" and "poke" at the prosecution's case does not amount to a personal attack on counsel's integrity.' [Citation.] Here, each side was simply urging the jury to draw different inferences from the evidence. As such, the prosecutor's comments were a fair response to defense counsel's remarks." (*People v. Young, supra,* 34 Cal.4th at p. 1191.) Finally, even assuming the prosecution is required to present its theory of the case at the beginning of its opening argument, the prosecution here did not fail to do so.

### C. *Penalty Phase Issues*

#### 1. *Admission of the Prior Testimony of Donald Loar*

In setting aside the first death judgment, we concluded defense counsel in the first trial gave ineffective assistance for failing to object to, among other things, certain testimony by informant Donald Loar, defendant's cellmate in 1987. (*In re Wilson, supra,* 3 Cal.4th at p. 955.) Loar's testimony included statements defendant made (and his descriptions of defendant's demeanor) following tape-recorded telephone conversations between defendant and Frank Kovacevich, a government agent posing as a "hit man." Loar arranged the telephone call between defendant and Kovacevich *after* Loar contacted the district attorney's office. (*People v. Wilson, supra,* 3 Cal.4th at p. 933.) Because "both the government and the informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks" (*In re Wilson, supra,* 3 Cal.4th at p. 950), this part of Loar's testimony was inadmissible under *Massiah v. United States, supra,* 377 U.S. 201. (*In re Wilson, supra,* 3 Cal.4th at p. 950.)

However, we also concluded that Loar's jailhouse conversations with defendant *before* Loar contacted the district attorney's office did not violate defendant's federal or state constitutional right to counsel. (*In re Wilson, supra,* 3 Cal.4th at p. 952.) "Accordingly, petitioner's statements to Loar, concerning petitioner's desire to find a 'hit man' to eliminate a possibly troublesome witness in his murder case, were not elicited improperly from him by a government agent. [Citation.]" (*Ibid.*)

At the penalty phase of the retrial, the prosecution requested to read into the record as section 190.3 evidence a portion of Loar's prior testimony we concluded was admissible.[7] (See *In re Wilson, supra,* 3 Cal.4th at p. 952.)

---

[7] At the pretrial proceedings, the prosecution first indicated that it intended to introduce Loar's prior testimony. Objecting on "Sixth Amendment grounds of no confrontation," defendant claimed that he was unable to cross-examine Loar on recently disclosed information regarding benefits purportedly given to Loar in exchange for his testimony. The trial court concluded, assuming the prosecution could establish due diligence in trying to locate Loar, that

The prosecution said it could not locate Loar, and argued that he should be deemed "unavailable." (Evid. Code, §§ 1291, 240.) Defendant objected that the prosecution's notice did not comply with section 190.3 because it was not given in writing within a reasonable time before trial. Defense counsel requested a continuance in the alternative. Overruling the notice objection, the trial court held a due diligence hearing to determine whether Loar was unavailable. It concluded that the prosecution established due diligence. A portion of Loar's testimony on direct examination was read into evidence before the jury. This testimony included statements that defendant told him "to get somebody from back east or a hit man, so to speak, to get rid of the witness so [defendant] wouldn't have to worry about—about that guy in court. He would beat his murder case."

On appeal, defendant contends admitting Loar's prior testimony violated his state and federal constitutional right of confrontation, Evidence Code section 1291, his Sixth Amendment right to counsel under *Massiah v. United States, supra,* 377 U.S. 201, and *Maine v. Moulton* (1985) 474 U.S. 159 [88 L.Ed.2d 481, 106 S.Ct. 477], his right to proper notice (§ 190.3), and other various constitutional rights.

### a. *Right of confrontation*

■ A criminal defendant has the right under both the federal and state Constitutions to confront the witnesses against him. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15.) This right, however, is not absolute. The high court recently reaffirmed the long-standing exception that "[t]estimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." (*Crawford v. Washington* (2004) 541 U.S. 36, 59 [158 L.Ed.2d 177, 124 S.Ct. 1354]; see *People v. Cromer* (2001) 24 Cal.4th 889, 892 [103 Cal.Rptr.2d 23, 15 P.3d 243].) Evidence Code section 1291 codifies this traditional exception. (*People v. Alcala* (1992) 4 Cal.4th 742, 784–785 [15 Cal.Rptr.2d 432, 842 P.2d 1192].) When the requirements of Evidence Code section 1291 are met, "admitting former testimony in evidence does not violate a defendant's right of confrontation under the federal Constitution. [Citations.]" (*People v. Mayfield* (1997) 14 Cal.4th 668, 742 [60 Cal.Rptr.2d 1, 928 P.2d 485].)

---

"absent any evidence of a promise from the district attorney, testimony of Mr. Loar in the first Wilson trial may be read to the jury without reference to any subsequent reduction in Mr. Loar's sentence." The trial court determined that there was "no evidence that Mr. Loar was offered a promise of leniency if he testified in the Wilson trial." It implicitly rejected defendant's related claim that the prosecution was required to file a written statement regarding in-custody informant testimony (§ 1127a, subd. (c)), and his claim that he had a Sixth Amendment right to cross-examine Loar on this purported promise. The prosecution, "for strategic reasons," did not present Loar's prior testimony during the guilt phase.

Evidence Code section 1291, subdivision (a)(2), provides that former testimony is not rendered inadmissible as hearsay if the declarant is "unavailable as a witness," and "[t]he party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing." In turn, Evidence Code section 240, subdivision (a)(5), states a declarant is "unavailable as a witness" if the declarant is "[a]bsent from the hearing and the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process."

Loar's former testimony was offered against defendant, who was a party in the first trial, and defendant's "interest and motive" in examining Loar in the first trial was identical to that in this retrial. (Evid. Code, § 1291, subd. (a)(2).) Defendant does not contend otherwise. However, defendant claims that the prosecution failed to show it used reasonable diligence trying to locate Loar; thus, the trial court erroneously deemed Loar "unavailable as a witness." (Evid. Code, §§ 240, subd. (a)(5), 1291, subd. (a)(2).) For reasons that follow, we disagree.

### (1) *"Unavailable as a witness"*

The term "reasonable diligence" or "due diligence" under Evidence Code section 240, subdivision (a)(5) " 'connotes persevering application, untiring efforts in good earnest, efforts of a substantial character. [Citations.]' " (*People v. Cromer, supra,* 24 Cal.4th at p. 904; *id.* at p. 898 [reasonable diligence same as due diligence].) Considerations relevant to this inquiry include the timeliness of the search, the importance of the proffered testimony, and whether leads of the witness's possible location were competently explored. (*Id.* at p. 904.) We independently review a trial court's due diligence determination. (*Id.* at p. 901.)

At a March 11, 1994, due diligence hearing, Detective William Collette testified that in November 1993, he made efforts over two days to locate Loar, including visiting his last known address, attempting to locate his known associates, and checking police, county, and state records with the 15 different names Loar had used. However, Detective Collette was unsuccessful in finding him.

Defendant argues that once this court reversed the judgment in 1992, the prosecution should have contacted and monitored Loar, who was still in prison or recently released at that time. He reiterates his claim at trial that Detective Collette should have attempted to locate Loar's family, checked

with the post office for Loar's forwarding address, followed up with his visitors in prison, and determined whether he was a party in any civil actions. As a result, defendant argues, the prosecution did not use reasonable diligence to locate Loar. Under our independent review, we conclude that the prosecution exercised due diligence.

The prosecution is not required "to keep 'periodic tabs' on every material witness in a criminal case . . . ." (*People v. Hovey* (1988) 44 Cal.3d 543, 564 [244 Cal.Rptr. 121, 749 P.2d 776].) Also, the prosecution is not required, absent knowledge of a "substantial risk that this important witness would flee," to "take adequate preventative measures" to stop the witness from disappearing. (*Ibid.*, citing *People v. Louis* (1986) 42 Cal.3d 969 [232 Cal.Rptr. 110, 728 P.2d 180].) Except for describing Loar as "unreliable and of suspect credibility," defendant does not point to any evidence that the prosecution knew of a substantial risk that Loar would disappear. Moreover, Detective Collette checked police, county, and state records using Loar's 15 aliases. He checked the records again on the day before the due diligence hearing. He also visited Loar's last known address and one of his known associates. Based on the foregoing, we conclude the prosecution used reasonable diligence in trying to locate Loar.

Although defendant criticizes the prosecution for starting the search a year after we reversed the judgment in November 1992, such delay was not unreasonable. Both defense counsel and the prosecution believed the retrial could not realistically begin any earlier than September 1993, and after several continuances, the first witness testified on February 22, 1994. "[I]t is unclear what effective and reasonable controls the People could impose upon a witness who plans to leave the state, or simply 'disappear,' long before a trial date is set." (*People v. Hovey, supra,* 44 Cal.3d at p. 564 [due diligence found where investigators began search for witness one month before trial testimony was needed].)

Defendant's claim that Detective Collette should have made additional efforts to find Loar, e.g., checking the post office, locating Loar's family, contacting Loar's prison visitors, does not change our conclusion that the prosecution exercised reasonable diligence. "That additional efforts might have been made or other lines of inquiry pursued does not affect this conclusion. [Citation.] It is enough that the People used reasonable efforts to locate the witness." (*People v. Cummings* (1993) 4 Cal.4th 1233, 1298 [18 Cal.Rptr.2d 796, 850 P.2d 1].) Thus, the trial court did not err in determining that Loar was "unavailable as a witness." (Evid. Code, § 240.)

### (2) *"Opportunity to cross-examine"*

Both the United States Supreme Court and this court have concluded that "when a defendant has had an opportunity to cross-examine a witness at the time of his or her prior testimony, that testimony is deemed sufficiently reliable to satisfy the confrontation requirement [citation], regardless whether subsequent circumstances bring into question the accuracy or the completeness of the earlier testimony. [Citation.]" (*People v. Samayoa, supra,* 15 Cal.4th at pp. 851–852, citing *California v. Green* (1970) 399 U.S. 149 [26 L.Ed.2d 489, 90 S.Ct. 1930].) In *Crawford v. Washington,* the high court stated that a prior opportunity to cross-examine a witness was "dispositive" of the admissibility of his testimonial statements, "and not merely one of several ways to establish reliability." (*Crawford v. Washington, supra,* 541 U.S. at pp. 55–56.) Because defendant had an opportunity to cross-examine Loar at the first trial, this satisfied the confrontation clause.

However, relying mainly on *Ohio v. Roberts* (1980) 448 U.S. 56 [65 L.Ed.2d 597, 100 S.Ct. 2531], defendant contends that Loar's prior testimony should have been excluded under the confrontation clause because his testimony was unreliable. Specifically, he claims Loar's prior testimony was unreliable because (1) at the time he cross-examined Loar in the first trial, defense counsel did not have information that Loar met with detectives in May 1987 before Loar had the jailhouse conversation with defendant; (2) the jury did not hear about Loar's reduced sentence purportedly given in exchange for his testimony; (3) defense counsel ineffectively cross-examined Loar at the first trial; and (4) Loar was an informant in, what defendant contends is, "the now-notorious Los Angeles informant ring, a fact that renders the credibility of his testimony non-existent." We note that the high court has since overruled *Ohio v. Roberts.* (*Crawford v. Washington, supra,* 541 U.S. at p. 68.)

*Crawford v. Washington* made clear that reliability is not part of the inquiry under the confrontation clause: "To be sure, the Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination. The Clause thus reflects a judgment, not only about the desirability of reliable evidence (a point on which there could be little dissent), but about how reliability can best be determined." (*Crawford v. Washington, supra,* 541 U.S. at p. 61.) In other words, "[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." (*Id.* at pp. 68–69.)

In any event, for reasons stated below, we reject defendant's claim that Loar's testimony was unreliable.

### (a) *New information about May 6, 1987, meeting*

Asserting that Loar was "more of a police agent than was suspected," defendant emphasizes that his original trial counsel did not know that Loar met with Detectives Collette and Miller[8] on May 6, 1987. Defendant points to a declaration by Forest Elliott, Jr., an attorney who represented both defendant and Loar at some point. The parties discussed the contents of this declaration in the retrial.

In his declaration, Elliott claimed that on May 6, 1987, he was representing Loar in a matter at a Long Beach courthouse. Detectives Collette and Miller were at the courthouse on that date, waiting for Loar. Loar voluntarily spoke to the detectives alone. Elliott's declaration did not assert he heard what Loar and the detectives talked about, or that Loar or anyone else told him what was discussed in that conversation. However, Elliott stated he "now understands why" Loar wanted to talk to the detectives; Elliott posited that Loar testified against defendant and "collud[ed]" with Prosecutor Hodgman and Judge Sheldon to obtain "an illegal reduction in sentence to 'time served' (none of which was served in a state prison)."

Defendant argues it is significant that Loar met with these detectives at this time because Loar had testified he had the jailhouse conversation with defendant in the late summer to early fall of 1987. He asserts that Loar should have been questioned about this earlier meeting with detectives because "an inquiry into this area was crucial to assessing credibility, for it brings up the question of whether Mr. Loar was attempting to elicit information as a police agent." Even if the prosecution or detectives did not promise Loar anything in exchange for his testimony, defendant claims the issue is *Loar's* expectation of what benefits he would receive. We disagree.

Contrary to defendant's contention, this information of a May 6, 1987, meeting between Loar and detectives, which was not disclosed at the first trial, does not undermine the reliability of Loar's testimony. As the Attorney General points out, Elliott's declaration only shows that Loar may have met with Detectives Collette and Miller on May 6, 1987. Nothing suggests that

---

[8] Defendant points out that Detectives Collette and Miller were implicated in another capital appeal for offering assistance to a key prosecution witness. (*People v. Morris* (1988) 46 Cal.3d 1, 24–34 [249 Cal.Rptr. 119, 756 P.2d 843] [on witness's behalf, Detective Collette wrote letters outlining witness's cooperation in murder investigation].) However, "we cannot consider on appeal evidence that is not in the record. [Citation.]" (*People v. Fairbank* (1997) 16 Cal.4th 1223, 1249 [69 Cal.Rptr.2d 784, 947 P.2d 1321].)

this conversation between Loar and the detectives was about defendant, as opposed to any other matter. Moreover, Loar's testimony revealed that he previously cooperated as an informant with at least two district attorney's offices over the years. Finally, Loar's prior testimony revealed that he was—at the time he testified—in the custody of the Los Angeles County Sheriff for violating probation arising from a fraud conviction, and that he had previously been convicted of burglary and possession of heroin with the intent to sell. The evidence of Loar's prior convictions would have already exposed his credibility to impeachment. (*People v. Morris, supra,* 46 Cal.3d at p. 34; see Evid. Code, § 788; CALJIC No. 2.20.)

Given the evidence of Loar's prior cooperation with law enforcement, the evidence of Loar's prior convictions, and the lack of any evidence that the May 6, 1987, meeting was about defendant, we conclude that had the first jury known about the meeting, this would not have significantly altered the jury's view of Loar's credibility.

### (b) *Subsequent reduction in Loar's sentence*

Next, defendant claims that the trial court "exacerbated the unfair prejudice" by ordering that Loar's prior testimony be read without reference to any subsequent reduction in Loar's sentence. Defendant asserts that after Loar testified in the 1988 trial, the original prosecutor, Mr. Hodgman, asked a superior court "in secret" to modify Loar's previously imposed sentence in another case based on his assistance in the Wilson case.

In the retrial, the prosecution conceded Loar received a reduced sentence, but maintained there was no *prior deal* made in exchange for Loar's testimony. The prosecution explained that Hodgman assisted Loar in reducing his sentence because Loar spent time in jail awaiting his trial testimony and lost credits he would have otherwise earned in state prison. The trial court here concluded that from its "reading of all the documents, it may be that Mr. Loar hoped for a reduction in his sentence, but there is no evidence that there was any agreement or promise from the district attorney." However, the court suggested that defendant could subpoena Hodgman to question him about any prior deal Loar had in exchange for his testimony. There is no evidence in the record that defendant did so.

As noted above, the prosecution explained the reason why Hodgman subsequently requested leniency for Loar. Because substantial evidence supports the trial court's finding that there was no agreement, we must defer to it. (See *People v. Fairbank, supra,* 16 Cal.4th at p. 1249.) Indeed, on appeal, defendant mainly asserts that Loar was "hoping to gain" special treatment in exchange for his testimony; he does not argue that there was a " 'preexisting

arrangement,' " either explicit or implicit, between Loar and the prosecution.[9] (*Id.* at p. 1247.) Thus, defendant's claim that the trial court improperly failed to tell the jury about Loar's subsequent sentence reduction is without merit.

### (c) *Ineffective cross-examination*

Defendant also contends that defense counsel's allegedly ineffective cross-examination of Loar rendered this testimony unreliable. He complains that prior defense counsel never asked Loar, among other things, how many times he testified in other cases, whether he expected any leniency or benefit for his testimony, about his ability to remember, and about his meetings with detectives or prosecutors. Defendant argues "the cross-examination of Mr. Loar in the first trial failed to adequately and zealously confront his testimony, and failed to test Mr. Loar's credibility in any meaningful way." For reasons that follow, we disagree.

Contrary to defendant's contention, defense counsel's failure to explore certain areas on cross-examination does not render Loar's testimony inadmissible under Evidence Code section 1291. "As long as defendant was given the *opportunity* for effective cross-examination, the statutory requirements were satisfied; the admissibility of this evidence did not depend on whether defendant availed himself fully of that opportunity. [Citations.]" (*People v. Zapien* (1993) 4 Cal.4th 929, 975 [17 Cal.Rptr.2d 122, 846 P.2d 704], italics added; see *People v. Smith* (2003) 30 Cal.4th 581, 611 [134 Cal.Rptr.2d 1, 68 P.3d 302] ["it is the opportunity and motive to cross-examine that matters, not the actual cross-examination"].) Moreover, "the admission of . . . testimony under Evidence Code section 1291 does not offend the confrontation clause of the federal Constitution simply because the defendant did not conduct a particular form of cross-examination that in hindsight might have been more effective." (*People v. Samayoa, supra,* 15 Cal.4th at p. 851, citing *People v. Zapien, supra,* 4 Cal.4th at p. 975.)

We reject defendant's claim that we must nonetheless examine the effectiveness of the cross-examination under *Ohio v. Roberts, supra,* 448 U.S. 56, and *Mancusi v. Stubbs* (1972) 408 U.S. 204 [33 L.Ed.2d 293, 92 S.Ct. 2308]. In *Ohio v. Roberts,* the high court explained that in an "extraordinary" case, for example, where a court had already determined that a defendant received ineffective representation from counsel appointed only four days before trial (see *Mancusi v. Stubbs, supra,* 408 U.S. at p. 209), "it was necessary to explore the character of the actual cross-examination to ensure that an

---

[9] To the extent defendant claims there was a preexisting agreement between Loar and Detectives Collette and Miller, he does not present any evidence of such agreement. Loar's contact with the detectives "did not by itself make him a police agent. [Citation.]" (*People v. Fairbank, supra,* 16 Cal.4th at p. 1248.)

adequate opportunity for full cross-examination had been afforded to the defendant. [Citation.]" (*Ohio v. Roberts, supra*, 448 U.S. at p. 73, fn. 12.) Absent such "unusual circumstances," no inquiry into effectiveness is required. (*Ibid.*) We conclude that no such unusual circumstances are present here.

For instance, unlike in *Mancusi v. Stubbs*, the record does not indicate, and defendant does not suggest, that his prior defense counsel had minimal time for trial preparation and therefore could not effectively cross-examine Loar. Moreover, as the Attorney General contends, defense counsel's ineffective assistance in the first trial, which was based on his failure to object to certain testimony under *Massiah v. United States, supra*, 377 U.S. 201, did not bear directly on his actual questioning of Loar. Defense counsel's failure to identify a meritorious *Massiah* claim does not necessarily indicate an inability to effectively cross-examine a witness.

### (d) *Nature of informant testimony*

■ We also reject defendant's unsubstantiated assertion that Loar was an informant in, what defendant describes as, "the now-notorious Los Angeles informant ring." We have consistently rejected claims that informant testimony must be excluded because it is "inherently unreliable." (*People v. Ramos* (1997) 15 Cal.4th 1133, 1165 [64 Cal.Rptr.2d 892, 938 P.2d 950].)

■ In sum, because we conclude defendant was given an opportunity to cross-examine Loar in the first trial, and Loar was "unavailable" under Evidence Code section 240, Loar's former testimony was admissible pursuant to Evidence Code section 1291. As such, admitting this testimony did not violate defendant's right of confrontation under the federal Constitution. (*Crawford v. Washington, supra*, 541 U.S. at p. 59; *People v. Mayfield, supra*, 14 Cal.4th at p. 742.) Moreover, even assuming that the reliability of Loar's testimony is pertinent to the issue of confrontation, defendant fails to show that Loar's former testimony was unreliable to justify its exclusion at the retrial. Significantly, defendant himself testified that he and Loar discussed eliminating a witness, i.e., Robert Berrie, who could tie defendant and the victim together before the murder. Although in contrast to Loar's prior testimony defendant denied actually wanting to eliminate Berrie, it was up to the jury as trier of fact to determine what weight to assign each person's testimony and to resolve any conflicts in testimony. (See *People v. Ramos, supra*, 15 Cal.4th at pp. 1164–1165.)

### b. *Massiah error*

In reversing the original judgment, we concluded that Loar's initial jailhouse conversation with defendant, before Loar contacted the district attorney's office, did *not* violate defendant's Sixth Amendment's right to counsel

under *Massiah v. United States*, *supra*, 377 U.S. 201. (*In re Wilson*, *supra*, 3 Cal.4th at pp. 952–953.) However, defendant maintains that new information of the May 6, 1987, meeting Loar had with detectives, along with Loar's reduced sentence, undermine the "assumption" that the jailhouse conversation occurred *before* Loar had contact with the district attorney's office. As such, he asserts that the use of Loar's prior testimony constituted *Massiah* error. (See *People v. Frye*, *supra*, 18 Cal.4th at pp. 991–992.) Defendant forfeited this *Massiah* claim because he failed to object on this ground at the retrial. Moreover, the claim lacks evidentiary support on this record.

■■■■ "To prove a violation of the Sixth Amendment, a defendant 'must establish that the informant . . . was acting as a government agent, i.e., under the direction of the government pursuant to a preexisting arrangement, with the expectation of some resulting benefit or advantage.' [Citation.]" (*People v. Fairbank*, *supra*, 16 Cal.4th at p. 1247.) A witness's reduced sentence, without "more specific proof of a deal," has little probative value of the witness's state of mind or improper motive. (*People v. Ramos*, *supra*, 15 Cal.4th at p. 1165; see *People v. Williams*, *supra*, 16 Cal.4th at p. 204 [subsequent, favorable treatment of informant's sentence insufficient to show "informant was motivated to inform by prosecutorial promises of leniency"].)

The trial court here found there was no evidence that Loar had a prior deal with the prosecution to give his testimony in exchange for leniency. (See *ante*, at p. 339, fn. 7.) Elliott's declaration did not establish that the May 6, 1987, conversation Loar had with detectives was about defendant. The fact that Loar met with detectives did not "by itself make him a police agent." (*People v. Fairbank*, *supra*, 16 Cal.4th at p. 1248.) Nor was Loar's subsequent sentence reduction evidence that Loar had a prior deal with the prosecution. (See *ante*, at pp. 345–346; *People v. Williams*, *supra*, 16 Cal.4th at p. 204; *People v. Ramos*, *supra*, 15 Cal.4th at p. 1165.) Based on the foregoing, we conclude there was no *Massiah* violation.

c. *Section 190.3*

As relevant here, section 190.3 provides that "no evidence may be presented by the prosecution in aggravation unless notice of the evidence to be introduced has been given to the defendant within a reasonable period of time as determined by the court, prior to trial." (§ 190.3, 4th par.) During voir dire at the beginning of the guilt phase, the prosecution listed Loar as a possible witness. During the guilt phase, it again verbally informed the court and defense counsel that it anticipated introducing the prior testimony of Loar.

Contrary to defendant's suggestion, this notice was sufficient pursuant to section 190.3. (See *People v. Cunningham* (2001) 25 Cal.4th 926, 1015–1016 [108 Cal.Rptr.2d 291, 25 P.3d 519].)

## 2. *Admission of the Testimony of Farrell Lee Torregano*

In the first trial, Farrell Lee Torregano, an inmate in the Los Angeles County jail at the same time defendant was there, testified that defendant admitted to him that he shot Swader twice in the head. (*People v. Wilson, supra,* 3 Cal.4th at p. 933.) At the start of the penalty phase in the retrial, the prosecution informed the trial court it intended to call Torregano as a witness pursuant to section 190.3. Over defendant's objection that there was insufficient notice, the trial court admitted Torregano's testimony, concluding that "sufficient notice has been given pursuant to Penal Code section 190.3." On appeal, defendant again claims that the prosecution did not give proper notice of Torregano's testimony because it was not in writing (§ 190.3), and that the prosecution did not satisfy the requirements for the admission of informant testimony. (§ 1127a, subd. (c).) He also argues that Torregano's testimony was "troublingly unreliable," in violation of various constitutional rights. For reasons that follow, we deny defendant's claims, which we discuss in turn.

### a. *Section 190.3*

As discussed above, section 190.3 provides that "no evidence may be presented by the prosecution in aggravation unless notice of the evidence to be introduced has been given to the defendant within a reasonable period of time as determined by the court, prior to trial." (§ 190.3, 4th par.) Contrary to defendant's contention, "section 190.3 requires *notice,* not written notice." (*People v. Smith, supra,* 30 Cal.4th at p. 620.) During voir dire at the beginning of the guilt phase, the prosecution listed Torregano as a possible witness. During the guilt phase, it again verbally informed the court and defense counsel that it anticipated calling Torregano. Although the prosecution did not call Torregano in its case-in-chief, it reserved calling him as a rebuttal witness if necessary. Ultimately, Torregano testified during the penalty phase only.

The purpose of section 190.3's notice requirement "is to advise the accused of the evidence against him so that he may have a reasonable opportunity to prepare a defense at the penalty phase. [Citation.]" (*People v. Hart, supra,* 20 Cal.4th at p. 639.) Notwithstanding the verbal notice discussed above, defendant claims that he "detrimentally relied" on the fact that the prosecution did not call Torregano in the *guilt* phase; as such, he did not anticipate that Torregano would be a witness in the *penalty* phase. Contrary to defendant's contention, his reliance on this fact does not help him.

Section 190.3 requires that a defendant be given a reasonable *opportunity* to defend against the prosecution's aggravating evidence. (*People v. Hart, supra*, 20 Cal.4th at p. 639.) Defendant here was given that opportunity after the prosecution informed him, as early as voir dire, that it intended to call Torregano as a witness. The prosecution was not required to provide *separate* pretrial notice that it intended to call Torregano at the penalty phase. (See *People v. Champion* (1995) 9 Cal.4th 879, 942 [39 Cal.Rptr.2d 547, 891 P.2d 93] [notice of evidence used at guilt phase not required at penalty phase]; see also *People v. Superior Court (Mitchell)* (1993) 5 Cal.4th 1229, 1233 [23 Cal.Rptr.2d 403, 859 P.2d 102] ["penalty phase of a capital trial is merely a part of a single, unitary criminal proceeding"].) Thus, we deny defendant's claim based on section 190.3.

b. *Section 1127a, subdivision (c)*

Defendant claims that the prosecution failed to comply with section 1127a, subdivision (c). This subsection provides that "[w]hen the prosecution calls an in-custody informant as a witness in any criminal trial, contemporaneous with the calling of that witness, the prosecution shall file with the court a written statement setting out any and all consideration promised to, or received by, the in-custody informant." (§ 1127a, subd. (c).) At trial, the prosecution denied giving Torregano any consideration for his testimony: "I'm representing to the court that I've spoken to Mr. Torregano, asked for his testimony, that he has asked for nothing, and that I've promised him nothing. So to that extent, I have complied with [section] 1127a. There is no deal here, nor, to the best of my knowledge, was there ever any deal in terms of Mr. Torregano's testimony in 1988 or Mr. Loar's testimony then." The prosecution suggested defendant could impeach Torregano's testimony if he believed Torregano received any benefit.

Regarding defendant's evidence of a possible benefit, the prosecution explained that defense counsel "has pointed to two cases arising in 1987 and 1988, prior to Mr. Torregano's testimony in this trial—this Wilson trial in June of '88, in which [defense counsel] feels there was an inappropriate sentence and one that suggests that there was a deal made." Apart from this oblique reference to "an inappropriate sentence," defendant does not identify any credible evidence that Torregano expected or received any consideration for his testimony. (*People v. Ramos, supra*, 15 Cal.4th at p. 1165.) Furthermore, a witness's reduced sentence, without "more specific proof of a deal," has little probative value of the witness's state of mind or improper motive. (*Ibid.*)

Assuming the prosecution was required to provide written notice under section 1127a, subdivision (c), that there was *no* consideration, we conclude defendant suffered no prejudice from the prosecution's failure to do so. As the Attorney General points out, the prosecution verbally notified the trial court and defendant by providing information that would have been in any written statement, i.e., that Torregano neither received, nor was promised, any consideration for his testimony.

### c. *Reliability*

Defendant argues that the admission of Torregano's allegedly unreliable testimony gave rise to constitutional violations. However, because defendant objected at trial based only on statutory violations (§§ 190.3, 1127a), he has forfeited his state and federal constitutional challenges by failing to object on these grounds. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1155 [36 Cal.Rptr.2d 235, 885 P.2d 1].)

Moreover, the claims lack merit. Without pointing to any specific evidence in his case, defendant generally states that informant testimony is "evidence of the most questionable reliability," and that "Los Angeles County prosecutions in the 1980s were notorious for the misuse of this type of evidence." We have consistently rejected claims that informant testimony is "inherently unreliable." (*People v. Ramos, supra*, 15 Cal.4th at p. 1165.) Defendant was entitled to challenge Torregano's testimony in front of the jury, but he presents no reason for its exclusion.

### 3. *Denial of Motion for Continuance*

During the penalty phase, the prosecution gave notice that it intended to present witness Farrell Lee Torregano and witness Rose Wigley (the younger sister of victim Swader), as well as evidence of Donald Loar's prior testimony. Claiming surprise, defense counsel objected to the proffered testimony and said he was at a "severe handicap" and "disadvantage" because he did not have time to subpoena unidentified witnesses to impeach the testimony of Loar and Torregano.[10] In the alternative, he asked for a continuance to subpoena the witnesses. The trial court overruled defendant's objection, and implicitly denied his continuance motion.

On appeal, defendant claims the trial court abused its discretion in denying a continuance. For reasons that follow, we disagree.

---

[10] Defendant did not indicate he intended to impeach the testimony of Rose Wigley, who would later testify as to victim impact. (See *post*, at p. 355)

■ "A motion for continuance should be granted only on a showing of good cause. (§ 1050, subd. (e).)" (*People v. Seaton* (2001) 26 Cal.4th 598, 660 [110 Cal.Rptr.2d 441, 28 P.3d 175].) To support a continuance motion to secure a witness's attendance at trial, a showing of good cause requires a demonstration, among other things, that the defendant exercised due diligence to secure the witness's attendance. (*People v. Jenkins* (2000) 22 Cal.4th 900, 1037 [95 Cal.Rptr.2d 377, 997 P.2d 1044].) The standard of review for a trial court's denial of a continuance motion is abuse of discretion. (*Ibid.*) We conclude that defendant failed to show he exercised due diligence in securing the impeaching witnesses' attendance. Thus, the trial court did not abuse its discretion.

■ As discussed above, defendant was aware—as early as jury selection—that the prosecution intended to introduce the testimony of Torregano and the prior testimony of Loar possibly during the guilt phase. Despite being informed of this testimony long before the penalty phase, defense counsel admitted he "did not subpoena or prepare to have those witnesses available to rebut the testimony." We conclude defendant failed to show he exercised any diligence in attempting to obtain the impeaching witnesses. His constitutional challenges based on this claim necessarily fail. As we have observed, "The trial court has substantial discretion in ruling on midtrial motions to continue the case, and appellate challenges to a trial court's denial of such a motion are rarely successful. [Citations.]" (*People v. Seaton, supra,* 26 Cal.4th at p. 660.)

### 4. Failure to Instruct on the Meaning of "Life Without the Possibility of Parole"

On appeal, defendant contends the trial court had a sua sponte duty to instruct on the meaning of the penalty "life without possibility of parole." He states that certain jurors' responses indicated "there were serious doubts among many of the potential jurors that a life without parole sentence meant parole ineligibility." Relying on *Simmons v. South Carolina* (1994) 512 U.S. 154 [129 L.Ed.2d 133, 114 S.Ct. 2187], and its progeny, defendant also asserts that because his future dangerousness was at issue, the trial court was constitutionally required to inform the jury that such a sentence meant defendant was statutorily ineligible for parole. We disagree.

■ Absent a request, a trial court is not required to instruct on the meaning of "life imprisonment without possibility of parole." (*People v. Holt* (1997) 15 Cal.4th 619, 688 [63 Cal.Rptr.2d 782, 937 P.2d 213]; *People v. Sanders* (1995) 11 Cal.4th 475, 561–562 [46 Cal.Rptr.2d 751, 905 P.2d 420]; *People v. Bonin* (1988) 46 Cal.3d 659, 698 [250 Cal.Rptr. 687, 758 P.2d 1217].) This term does not have "a technical meaning which requires a sua

sponte definitional instruction." (*People v. Holt, supra,* 15 Cal.4th at p. 688, citing *People v. Bonin, supra,* 46 Cal.3d at p. 698.) Contrary to defendant's contention, the record does not show that the jurors "share[d] a 'common and widespread misconception' " that a sentence of life imprisonment without possibility of parole does not mean what it says. (*People v. Bonin, supra,* 46 Cal.3d at p. 698.)

During voir dire, defense counsel questioned five prospective jurors, two of whom eventually sat on the jury, about their responses to the following question on the juror questionnaire: "When a jury votes that a person be sentenced to life in prison without the possibility of parole, what does that mean to you?" Zara C., who sat on the jury, had written, "I wonder if that will happen." After defense counsel told her the judge will explain this type of sentence and said "we have to assume" the sentence will be carried out, she replied: "As I've sat in this, I realize that. I didn't know that that was—let's put it this way. If the judge says he's sentenced to life imprisonment without possibility of parole, I would believe that." Another sitting juror, Glenda L., said although she had "some reservations" accepting as "fact" that a sentence of life imprisonment without the possibility of parole is just that, she "would have to" accept it.

Prospective Juror Wilhelmina R. had written on her juror questionnaire she thought this sentence meant that a defendant "may be out some day." When defense counsel asked Wilhelmina R., "If the judge told you that [life in prison without possibility of parole is just that], would you accept it as a fact," she replied, "Yeah, of course." She earlier stated that she would "have to hear" the judge tell her that. Prospective Alternate Juror David G. wrote the following answer regarding what his opinion was on life in prison without the possibility of parole: "If found guilty—then the possibility of parole [*sic*]." During voir dire, he explained that "there's always some—somewhat changes along the line after the fact. That can be possible, yes." However, after defense counsel stated that "there is no possibility of parole when that sentence is imposed," David G. said he understood. Moreover, on his juror questionnaire he wrote that he thought a sentence of life in prison without possibility of parole was worse than death for a defendant because "if guilty—person must remain behind bars for life."

Another prospective alternate juror, Donald C., wrote on his questionnaire that he "always doubted the phrase 'without the possibility of parole.' " During voir dire, he explained that he "wasn't aware there was a law that made that exactly the definition, that there was no possibility." However, when defense counsel asked Donald C. if the judge assured him, would he accept as a "fact" that life imprisonment without possibility of parole was just that, he replied, "Yes, I would." On his juror questionnaire, Donald C. also

wrote that this sentence meant "that the person is put away from society, never to be allowed out of custody." Wilhelmina R., David G., and Donald C. were ultimately excused, and did not sit on the jury.

Although defense counsel told the jury that the trial court would instruct on the meaning of a "life without possibility of parole" sentence, defense counsel did not request such an instruction and the trial court did not instruct sua sponte. The trial court did, however, give both introductory and concluding jury instructions on the two penalty alternatives, life without possibility of parole and death. (CALJIC Nos. 8.84, 8.88.)

We conclude that these jurors' responses do not reflect that jurors shared a " 'common and widespread misconception' " about the meaning of life imprisonment without possibility of parole. (*People v. Bonin, supra,* 46 Cal.3d at p. 698.) Rather than indicating a misconception, Zara C.'s responses simply showed that she previously did not know that the law provided for such a sentence, and that if "the judge says he's sentenced to life imprisonment without possibility of parole," she "would believe it." Also, Glenda L.'s "reservations" about the meaning of this type of sentence mainly reflected her view that convicted defendants, including those who serve life in prison without possibility of parole, "should lose all their rights." She complained that instead, such defendants "are allowed to go to school, *they are allowed to appeal, they are allowed to come back into court. Some of them have even made their way out of prison for things like that.* So I don't think they've lost all their rights." The italicized language reasonably reflects that rather than thinking that defendants who serve life without possibility of parole would somehow be released on parole, Glenda L. was referring to defendants who are released due to appellate reversals. Ultimately, she stated that she "would have to" accept the judge's instruction on this type of sentence. Despite what defense counsel described as her "strong views about punishment and death penalty," Glenda L. emphasized that she could remain fair and impartial and would follow the law.

The responses of three prospective jurors who were excused do not strengthen defendant's claim that the jurors in general were laboring under a misconception. (*People v. Bonin, supra,* 46 Cal.3d at p. 698.) Even assuming that these three prospective jurors, and the two who sat on the jury, misunderstood what life without possibility of parole meant, responses from five individuals do not establish that such a misconception was " 'common and widespread.' " (*Ibid.* [responses of 10 out of 204 prospective jurors do not establish misconception was common and widespread]; *People v. Sanders, supra,* 11 Cal.4th at p. 562 [responses of eight prospective jurors "[o]ut of a large pool of prospective jurors"].)

Contrary to defendant's contention, *Simmons v. South Carolina, supra,* 512 U.S. 154, *Shafer v. South Carolina* (2001) 532 U.S. 36 [149 L.Ed.2d 178, 121 S.Ct. 1263], and *Kelly v. South Carolina* (2002) 534 U.S. 246 [151 L.Ed.2d 670, 122 S.Ct. 726], do not dictate otherwise. (*People v. Turner* (2004) 34 Cal.4th 406, 437–438 [20 Cal.Rptr.3d 182, 99 P.3d 505]; *People v. Snow* (2003) 30 Cal.4th 43, 123 [132 Cal.Rptr.2d 271, 65 P.3d 749].) "Under *Simmons* and its progeny, 'whenever future dangerousness is at issue in a capital sentencing proceeding . . . due process requires that the jury be informed that a life sentence carries no possibility of parole.' " (*People v. Turner, supra,* 34 Cal.4th at p. 438.) Defendant asserts the prosecutor here suggested defendant's future dangerousness by stating he "continues to be a threat" when presenting evidence of defendant's solicitation for murder.

Even assuming defendant's future dangerousness was at issue, these high court decisions "stemming from death sentences imposed under South Carolina law are readily distinguishable, in that the juries in those cases were told that the alternative to a death sentence was one of 'life imprisonment' without instruction that a capital defendant given such a sentence would not be eligible for parole. [Citations.]" (*People v. Snow, supra,* 30 Cal.4th at pp. 123–124.) Here, in contrast, the jury was instructed it could sentence defendant to death or "confinement in the state prison for life without possibility of parole." (CALJIC Nos. 8.84, 8.88.) As such, defendant's claim based on *Simmons* and its progeny fails.

### 5. *Admission of Victim Impact Evidence*

Just before the start of the penalty phase, the prosecution gave notice for the first time that it intended to call witness Rose Wigley, the younger sister of victim Swader, to testify as to victim impact. The prosecution explained that it "did not specifically know that it would be calling" Wigley because it had only recently learned her name; originally, the prosecution "had hoped to be able to call the children of the victim, but they were not available and did not want to come." The prosecution maintained that "victim impact evidence was something that was at all times intended to be called." Defendant objected on the ground that the notice did not meet the requirements of section 190.3, which provides that aggravating evidence with certain exceptions be "given to the defendant within a reasonable period of time as determined by the court, prior to trial." (§ 190.3, 4th par.) He alternatively requested a continuance. (See *ante,* at pp. 351–352.) Overruling defendant's objection and implicitly denying his continuance motion, the trial court found "from the totality of the circumstances, . . . sufficient notice has been given pursuant to Penal Code section 190.3." Wigley testified shortly thereafter.

On appeal, defendant again claims that the trial court improperly admitted Wigley's testimony because the prosecution failed to give adequate notice of

its intent to introduce this victim impact evidence, and that admitting this type of evidence "renders the sentencing scheme unconstitutionally vague and improper." Defendant also objects that Wigley's testimony "included some very improper aspects" because, in addition to describing her relationship with Swader, Wigley commented on defendant, whom she never met; she stated her own daughter tried to commit suicide to get her attention after Swader's two young daughters moved in with their family; and she said that one of Swader's daughters was afraid defendant would "do something to them."

█ "Under California law, victim impact evidence is admissible at the penalty phase under section 190.3, factor (a), as a circumstance of the crime, provided the evidence is not so inflammatory as to elicit from the jury an irrational or emotional response untethered to the facts of the case. [Citations.]" (*People v. Pollock* (2004) 32 Cal.4th 1153, 1180 [13 Cal.Rptr.3d 34, 89 P.3d 353]; *People v. Edwards* (1991) 54 Cal.3d 787, 834–836 [1 Cal.Rptr.2d 696, 819 P.2d 436]; see also *Payne v. Tennessee* (1991) 501 U.S. 808, 827 [115 L.Ed.2d 720, 111 S.Ct. 2597] ["if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no *per se* bar"].) The admission of this aggravating evidence is subject to the notice requirement under section 190.3: "Except for evidence in proof of the offense or special circumstances which subject a defendant to the death penalty, no evidence may be presented by the prosecution in aggravation unless notice of the evidence to be introduced has been given to the defendant within a reasonable period of time as determined by the court, prior to trial." (§ 190.3, 4th par.; see *People v. Roldan* (2005) 35 Cal.4th 646, 733 [27 Cal.Rptr.3d 360, 110 P.3d 289].) This provision requires that the defendant be given notice of the prosecution's intended aggravating evidence before the cause is called for trial or as soon thereafter as the prosecution learns of the existence of the evidence. (*People v. Roldan, supra,* 35 Cal.4th at p. 733.)

█ Citing *People v. Clark* (1993) 5 Cal.4th 950, 1033 [22 Cal.Rptr.2d 689, 857 P.2d 1099], the Attorney General, however, argues that because the impact of the murder on the victim's family is one of the circumstances of the crime, the prosecution was not required to give any notice of the victim impact testimony. We disagree. "Although we have found 'victim impact evidence admissible as a circumstance of the crime pursuant to section 190.3, factor (a)' [citation], generic, nonspecific notice that the prosecution intends to rely, as an aggravating factor, on the circumstances of the offense (see § 190.3, factor (a)) fails to give adequate notice that it also intends to present victim impact evidence from surviving family members." (*People v. Roldan, supra,* 35 Cal.4th at p. 733.) Moreover, the notice exception for "evidence in

proof of the offense or special circumstances" (§ 190.3, 4th par.), does not extend to victim impact evidence. (*People v. Roldan, supra,* 35 Cal.4th at p. 733.)

The question whether the prosecution provided timely notice of the victim impact evidence is close on this record. Apart from the prosecution's assertions at the penalty phase, the record does not clearly support that the parties discussed that there would be victim impact evidence. It is also unclear whether the prosecution gave notice of this evidence "as soon thereafter as [it] learned of the existence of the evidence. [Citation.]" (*People v. Roldan, supra,* 35 Cal.4th at p. 733.) In any event, we need not decide whether the prosecution's notice was timely under section 190.3 because defendant suffered no prejudice.

"The purpose of the notice provision is to afford defendant an opportunity to meet the prosecutor's aggravating evidence." (*People v. Taylor* (2001) 26 Cal.4th 1155, 1182 [113 Cal.Rptr.2d 827, 34 P.3d 937].) Although in seeking a continuance defendant specifically noted he intended to call witnesses to impeach the testimony of witnesses Loar and Torregano, he made no mention of impeaching witnesses with regard to Wigley. (See *ante,* at pp. 351–352 & fn. 10.) Because defendant fails to show how he could have rebutted or impeached Wigley's testimony had he received earlier notice, he fails to show prejudice. (See *People v. Taylor, supra,* 26 Cal.4th at p. 1182.) To the extent defendant argues that the notice was otherwise inadequate because the written notice did not state the *content* of Wigley's testimony, but simply stated that "Ms. Wigley, the victim's sister, will testify as to victim impact," we reject this argument. (See *People v. Hart, supra,* 20 Cal.4th at pp. 638–639.)

With respect to the substance of Wigley's testimony, we conclude that defendant forfeited his claim because he failed to object to the testimony as exceeding the scope of section 190.3, factor (a). (*People v. Garceau* (1993) 6 Cal.4th 140, 206 [24 Cal.Rptr.2d 664, 862 P.2d 664].) Moreover, we conclude Wigley's testimony constituted permissible victim impact evidence.

For instance, Wigley testified that she could not understand why someone whom Swader befriended and trusted would kill him. When detectives told her "it was for money," she said she "was angry someone would kill for that." Contrary to defendant's suggestion, her statements permissibly concerned the "immediate effects of the murder," i.e., her "understandable human reactions" on hearing someone had killed her brother for money. (*People v. Brown* (2004) 33 Cal.4th 382, 397–398 [15 Cal.Rptr.3d 624, 93 P.3d 244].) Moreover, Wigley's daughter's attempted suicide, other difficulties her family faced after Swader's daughters moved in with them, and his young daughter's understandable fear of defendant, properly showed how the victim's death affected his surviving relatives. (*Ibid.*)

■ Finally, we have rejected the claim that admitting victim impact evidence as a "circumstance[] of the crime" under section 190.3, factor (a), renders this provision unconstitutionally vague. (*People v. Boyette* (2002) 29 Cal.4th 381, 445, fn. 12 [127 Cal.Rptr.2d 544, 58 P.3d 391].)

### 6. *Alleged Prosecutorial Misconduct*

#### a. *Failure to comply with notice requirements (§ 190.3)*

Defendant claims that the prosecution committed misconduct by failing to give timely notice that it intended to present the testimony of Torregano and Wigley, and the prior testimony of Loar. We have rejected these claims regarding the lack of timely notice. (See *ante*, at pp. 349–351, 356–357.) Characterizing these claims as prosecutorial misconduct does not afford defendant relief.

#### b. *References to inadmissible evidence*

Defendant argues that the prosecution improperly asked defense expert Dr. Maloney, a forensic psychologist who had reviewed defendant's childhood psychological evaluations, questions to elicit inadmissible, aggravating evidence. Quoting *People v. Visciotti, supra,* 2 Cal.4th at page 81, defendant points out: "It is proper to question an expert about matter on which the expert bases his or her opinion and on the reasons for that opinion. A party attacking the credibility of the expert may bring to the jury's attention material that is relevant to the issue of which the expert was unaware [citation], but that party may not by its questions testify regarding the content of that material." Defendant maintains that the prosecution argued to the jury defendant's unadjudicated acts of criminal conduct, which were not introduced into evidence, or reviewed by the expert witness. Defendant failed to object on this ground at trial; thus, he has forfeited this claim on appeal. (*People v. Dennis, supra,* 17 Cal.4th at p. 519.) Moreover, for the reasons that follow, we conclude the prosecution did not commit misconduct.

■ A party "may cross-examine an expert witness more extensively and searchingly than a lay witness, and the prosecution was entitled to attempt to discredit the expert's opinion. [Citation.] In cross-examining a psychiatric expert witness, the prosecutor's good faith questions are proper even when they are, of necessity, based on facts not in evidence. [Citation.]" (*People v. Dennis, supra,* 17 Cal.4th at p. 519.)

Dr. Maloney testified on direct examination that when defendant was about 13 years old, he was placed in a psychiatric hospital for "bizarre behavior," and later explained that defendant displayed "juvenile delinquency, acting

out." Challenging Dr. Maloney's assessment (which was based on records prepared by defendant's prior attorneys and on defendant's own statements), the prosecution asked Dr. Maloney whether he had read a 1964 letter describing defendant's burglaries and assault with a loaded gun, which conduct had led to defendant's hospitalization. Dr. Maloney stated he did not recognize the letter. Dr. Maloney ultimately agreed with the prosecution that some of the "bizarre behavior" referred to behavior that was "criminal." The jury learned that several documents, none of which Dr. Maloney recognized or were admitted into evidence, contained information about defendant's 1964 burglaries and assault with a loaded gun, and his probation officer's assessment of defendant's parents' care and concern for him.

Contrary to defendant's assertion, the prosecution's cross-examination of Dr. Maloney was proper. Because Dr. Maloney relied only on documents provided by defense counsel and defendant's own statements, the prosecution was entitled to challenge Dr. Maloney on his assessment by asking whether he considered other documents. Moreover, the prosecution's reference to a letter from defendant's probation officer, which was not discussed during Dr. Maloney's cross-examination, was not prejudicial. (See *People v. Dennis, supra,* 17 Cal.4th at p. 521.) This letter, which was used to challenge Dr. Maloney's statement that defendant's parents were alcoholics, simply stated that defendant as an adolescent did not commit criminal violations "until September 9th of 1964 . . . is largely due to the excellent way in which Mr. and Mrs. Wilson have provided supervision, guidance, and professional care for [defendant]."

c. *Misstatement of the law*

During closing argument, the prosecution explained its burden of proof at the penalty phase: "It also changes the fact that normally when I get up and argue I have the burden of proof. I have to prove beyond a reasonable doubt that the offenses were committed and that the defendant is the person who committed that. [¶] We don't have that burden here. We have to, if you were to return a death verdict, show that the aggravating factors that we'll go through substantially outweigh the mitigating ones. But there's no burden one way or another."

Defendant claims the prosecution misstated the law in argument by asserting, "We don't have the burden here . . . [T]here's no burden one way or another." He argues that this statement was incorrect as to the solicitation of murder offense; the jury may only consider such offense as aggravating evidence under section 190.3, factor (b) if the prosecution proves it beyond a reasonable doubt. Defendant also asserts the prosecution misread CALJIC No. 8.88 by stating, "In order to return that judgment of death, you have to

find that the totality of aggravating circumstances substantially outweighs the mitigating circumstances." Because defendant failed to object on these grounds at trial, he has forfeited these prosecutorial misconduct claims on appeal.[11] (*People v. Farnam, supra,* 28 Cal.4th at p. 167.) In any event, the claims lack merit.

Taken in context, the prosecution's statement referred to its overall burden at the penalty phase; it did not suggest it did not have a burden of proof as to all issues in the case, including proving unadjudicated criminal conduct under section 190.3, factor (b). The prosecution merely stated that if the jury returns a death verdict, it must show that the aggravating factors outweigh the mitigating factors. The trial court instructed that "[b]efore a juror may consider any of such criminal act as an aggravating circumstance in this case, a juror must first be satisfied beyond a reasonable doubt that the defendant did in fact commit such criminal act." The prosecution did not argue against this particular burden. Moreover, the prosecution's reading of CALJIC No. 8.88 did not differ materially from the instruction the trial court read and the jury received in writing.[12] As such, the prosecution did not "water[] down" the necessary showing as defendant suggests.

### 7. Capital Sentencing Instructions Fail to Guide the Jury's Discretion

Defendant asserts that the penalty instructions, namely CALJIC No. 8.85, failed to sufficiently guide the jury's discretion, failed to define the mitigating factors, and were confusing. We disagree. Contrary to defendant's assertions, the instruction need not omit inapplicable sentencing factors (*People v. Earp* (1999) 20 Cal.4th 826, 899 [85 Cal.Rptr.2d 857, 978 P.2d 15]); it need not advise which factors are relevant as mitigating circumstances and which factors are relevant as aggravating circumstances (*People v. Farnam, supra,* 28 Cal.4th at pp. 191–192); the aggravating factors are not vague and ill-defined (*People v. Earp, supra,* 20 Cal.4th at p. 899); the use of the words "extreme" and "substantial" to describe potential mitigating evidence is not impermissible (*People v. Frye, supra,* 18 Cal.4th at p. 1029); and the jury need not determine the existence of the aggravating circumstances or the appropriateness of the death penalty beyond a reasonable doubt. (*People v. Earp, supra,* 20 Cal.4th at p. 899.) "In short, CALJIC No. 8.85 is

[11] As discussed previously with respect to defendant's claims of prosecutorial misconduct at the guilt phase (see *ante,* at p. 337, fn. 6), defendant's failure to object is not excused based on the trial court's admonition to counsel "to try and avoid interrupting one another during their arguments."

[12] The trial court stated: "To return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole."

not unconstitutionally vague and does not allow the penalty process to proceed arbitrarily . . . . [Citations.]" (*People v. Farnam, supra,* 28 Cal.4th at p. 192.) Defendant provides no basis for us to reconsider our decisions.

### 8. *Defendant's Sentence is Capricious, Arbitrary, Discriminatory, and Disproportionate*

The trial court denied defendant's motion to reduce his death sentence to life without the possibility of parole. Claiming the facts here do not rise to the level of a "truly death-deserving case," defendant insists that Anderson was as much or more involved in the crimes than defendant (and yet Anderson was not charged with any crime), and that this was simply a robbery-murder offense with just one victim. Asking this court to compare this case to other capital appeals, defendant claims his death sentence is capricious, arbitrary, discriminatory, and disproportionate in violation of the Eighth and Fourteenth Amendments to the United States Constitution. We disagree.

Intercase proportionality review is not required. (*People v. Griffin, supra,* 33 Cal.4th at p. 596.) Moreover, under *intra*case review, defendant's death sentence is not disproportionate to his individual culpability and moral guilt. (See *People v. Steele* (2002) 27 Cal.4th 1230, 1269 [120 Cal.Rptr.2d 432, 47 P.3d 225].) Defendant robbed and murdered Swader, who trusted defendant by employing him and allowing him to live in his home for a period of time. Defendant shot Swader twice in the head while he was asleep in order to take his money. Later, while in custody, defendant solicited the murder of a key prosecution witness who could place defendant and Swader together before the crimes. Moreover, contrary to defendant's suggestion, the alleged greater culpability of another person is irrelevant for purposes of intracase proportionality review. (See *People v. Beardslee* (1991) 53 Cal.3d 68, 111–112 [279 Cal.Rptr. 276, 806 P.2d 1311].)

In sum, these circumstances do not demonstrate that defendant's death sentence is disproportionate. (*People v. Steele, supra,* 27 Cal.4th at p. 1269; *People v. Seaton, supra,* 26 Cal.4th at p. 690 [the defendant "brutally beat to death an aged, defenseless man so he could rob the victim of his meager possessions"].)

### 9. *Challenge to Capital Sentencing Procedures*

Defendant claims that California's death penalty scheme violates the Eighth and Fourteenth Amendments to the United States Constitution by not genuinely narrowing the class of death-eligible defendants. (See *Lowenfield v. Phelps* (1988) 484 U.S. 231, 244 [98 L.Ed.2d 568, 108 S.Ct. 546].) He also

asserts that the sentencing scheme is unconstitutional because it does not provide for intercase proportionality review, and it gives prosecutors complete discretion to seek the death penalty. Finally, he claims the scheme has "built-in capriciousness" based on the purportedly confusing and ineffective penalty instruction, CALJIC No. 8.85.

We disagree. We have consistently rejected such constitutional challenges to our death penalty scheme. (See, e.g., *People v. Combs* (2004) 34 Cal.4th 821, 868 [22 Cal.Rptr.3d 61, 101 P.3d 1007]; *People v. Kipp* (2001) 26 Cal.4th 1100, 1137 [113 Cal.Rptr.2d 27, 33 P.3d 450].) Defendant offers no basis for us to reconsider our decisions. And we have rejected defendant's claim based on CALJIC No. 8.85. (See *ante*, at pp. 360–361.)

### 10. *Death Penalty Law Violates International Law*

■ Defendant maintains that California's death penalty procedure violates the International Covenant of Civil and Political Rights. We disagree. "International law does not prohibit a sentence of death rendered in accordance with state and federal constitutional and statutory requirements. [Citations.]" (*People v. Hillhouse, supra*, 27 Cal.4th at p. 511; see *People v. Brown, supra*, 33 Cal.4th at pp. 403–404.) Because we conclude that defendant's trial did not involve any violations of state or federal constitutional law, "we decline to find the law defective based on any provision of international law." (*People v. Brown, supra*, 33 Cal.4th at p. 404.)

### 11. *Aggravating Circumstances—Requirement of Jury Unanimity or a Substantial Majority of Jurors*

■ Defendant claims the trial court should have instructed the jury to unanimously agree that defendant solicited the murder of Berrie before it could consider it in aggravation under section 190.3. Relying on recent high court decisions, defendant claims the court's failure to instruct on unanimity violated his rights under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution and under parallel provisions of the California Constitution. We disagree. Juries are not constitutionally required to agree unanimously on aggravating factors. (*People v. Hillhouse, supra*, 27 Cal.4th at p. 511.) Contrary to defendant's assertion, *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348], and *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428], do not dictate otherwise. (*People v. Brown, supra*, 33 Cal.4th at p. 402; *People v. Prieto* (2003) 30 Cal.4th 226, 262–263 [133 Cal.Rptr.2d 18, 66 P.3d 1123] [*Apprendi* and *Ring* do not apply to the penalty phase in a capital case].)

## III. DISPOSITION

The judgment is affirmed.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., and Moreno, J., concurred.

Appellant's petition for rehearing denied August 24, 2005.