Filed 2/2/15  P. v. Brooks CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ANTHONY RAY BROOKS, SR.,<br><br>    Defendant and Appellant. | A137810<br><br>(Solano County<br>Super. Ct. No. VCR213930) |

**I.**

**INTRODUCTION**

Appellant Anthony Ray Brooks, Sr. was convicted of assaulting Frank McCormick with a deadly weapon and sentenced to an eight-year prison term.  He seeks reversal of the judgment on two grounds:  (1) prosecutorial misconduct; and (2) failure to conduct a hearing regarding his mental competence to stand trial.  We affirm.

**II.**

**STATEMENT OF FACTS**

The incident that gave rise to this case occurred between 1:00 and 2:00 a.m. on the morning of January 9, 2012, at Max Auto Top Shop in Vallejo, a car wash, upholstery shop, and makeshift residence where people paid to live, squatter style.  That morning the shop's residents included appellant, Frank McCormick, Dale Nance, and Charles "Mike" Kester.  Appellant's cousin "Ray-Ray" was also at the shop with his dog.  McCormick and Kester testified about the incident at trial.

1

McCormick testified that he and his roommate Nance were laying on their respective couches watching television and appellant was in the next room talking with Kester. Then Ray-Ray came into their room and McCormick told him to get his dog out of the shop. Suddenly appellant charged in and attacked McCormick, hit him several times with a paint pole, stabbed him in the thigh with a knife, and cut him across the ankle after he tried to defend himself by kicking appellant. McCormick testified his ankle wound was so severe his whole foot was "hanging off." McCormick also testified that he had known appellant for at least 20 years, never had any problems with him, and had considered him a friend.

Kester testified that he and appellant were in an adjacent room at the shop just before appellant's altercation with McCormick. Kester was in bed trying to sleep while appellant was attempting to attach Kester's knife to the end of a paint pole and threatening to cut Kester with it. Kester did not take appellant seriously, joked around with him and pretended to be afraid. Appellant's cousin Ray-Ray was also in the room, but went next door to use the bathroom. Kester heard McCormick yell at Ray-Ray to take the dog outside. Then appellant left the room, taking the paint pole and the knife. Kester heard yelling and a scuffle and went to investigate. He met Ray-Ray and appellant on their way out of McCormick's room. Kester asked appellant to give him the knife. Appellant complied and then left the shop with Ray-Ray. Kester found McCormick bleeding and attempted to administer aid. McCormick testified that Kester called the police, although Kester did not recall doing so. However, Kester was "certain" he gave the knife to the police. He could not remember seeing the pole after the fight and did not know what happened to it.[1]

Vallejo police officer Kyle Wylie was dispatched to Max Auto Top Shop at approximately 2:30 a.m. on the morning of January 9. Wylie testified that he found

---

[1] A defense investigator who interviewed Kester before trial testified that Kester reported he had slept through the altercation between appellant and McCormick and did not see any part of it. The investigator testified that Kester never mentioned the knife, the pole, or that appellant had threatened him that morning.

McCormick sitting in a chair bleeding profusely from his left upper thigh and the top of his right foot. There was blood on McCormick's clothes, pooled on the floor under the chair, and throughout a pathway cutting through all the junk and leading to the back of the shop. Wylie recalled McCormick told him that before he was attacked, he was awakened by appellant and Kester who were having an argument in the other room.[2] One of the other residents mentioned a pit bull dog, but the officer did not recall any mention of appellant's cousin or a man named Ray-Ray. Officer Wylie was at the shop for approximately 15 minutes before he went to another call. He did not find a knife or see any kind of a pole.

McCormick testified that after he gave his statement to the police, he was taken to the hospital by ambulance, where his thigh wound was sewn up. He had to have surgery to repair his ankle, and then he had to wear a cast for two weeks. At the time of trial, the ankle still caused him pain. McCormick admitted that he smoked marijuana every day, but testified that he had not smoked the morning of the attack. He also used to drink beer several times a week, but testified that he had not been drinking at the time of the attack. The prosecution introduced medical records describing McCormick's injuries. The defense introduced medical records containing admissions that McCormick smoked marijuana and drank at least one beer on January 9.

On February 12, 2012, Vallejo police officer Brian Estudillo was dispatched to the Max Auto Top Shop in response to a call from McCormick. When he arrived, McCormick waved him down on the street, and pointed to appellant, identifying him as his assailant. Officer Estudillo arrested appellant, informed him of his *Miranda*[3] rights and took his statement. Appellant told the officer that he and McCormick used to live together; they had an argument when McCormick was very drunk; and McCormick tried to attack him, but ended up falling on his own knife. Appellant did not testify at trial.

---

[2] Wylie testified that McCormick gave him a brief "overview" of what happened but did not tell the jury what McCormick actually said about the altercation.

[3] *Miranda v. Arizona* (1966) 384 U.S. 436.

3

## III.

## DISCUSSION

### A. The Prosecutor Did Not Commit Prejudicial Misconduct

#### 1. *Issue Presented and Legal Principles*

Appellant contends that the prosecutor committed misconduct during closing argument by misstating the law regarding the People's burden of proof. Appellant forfeited this claim of error by failing to object to the allegedly improper statements and request an admonition. (*People v. Wilson* (2005) 36 Cal.4th 309, 337 (*Wilson*).) Nevertheless, we address the merits of this claim in light of appellant's alternative claim that the failure to object constituted ineffective assistance of counsel.

"A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury." (*People v. Morales* (2001) 25 Cal.4th 34, 44; see also *People v. Farnam* (2002) 28 Cal.4th 107, 167; *Wilson*, *supra*, 36 Cal.4th at p. 337.)

In this case, appellant contends his federal due process rights were violated because the prosecutor's allegedly erroneous statements rendered his trial fundamentally unfair. " 'To prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner.' [Citation.] 'Prosecutors have wide latitude to discuss and draw inferences from the evidence at trial. [Citation.] Whether the inferences the prosecutor draws are reasonable is for the jury to decide. [Citation.]' [Citation.]" (*Wilson*, *supra*, 36 Cal.4th at p. 337.)

#### 2. *Background*

During her closing argument, the prosecutor urged the jury to apply the law set forth in the jury instructions to the "credible evidence." She reviewed the evidence establishing that defendant was present when the altercation occurred and that

4

McCormick was seriously injured, and then she focused the jury's attention on the need to determine whether McCormick's statement was credible. She proceeded to argue that the evidence supported McCormick's statement, and if the jury found that statement credible all of the elements of the assault charge were established. Then, the prosecutor made the following statement: "So those are the elements of the case, which is what beyond a reasonable doubt applies to. It doesn't apply to, where was the blood? It doesn't apply to, where is the knife now? It applies to the elements of this case. Do you believe beyond a reasonable doubt that these elements have been met? [¶] That's what beyond a reasonable doubt is."

The prosecutor also spent time attempting to show that appellant's version of the altercation was a "flat-out lie." At the conclusion of this argument, she made this statement: "Once you've decided the evidence, you apply it to the facts. Credibility is separate from beyond a reasonable doubt. Credibility is your determination of the evidence you believe and you apply that evidence to the law."

Like the prosecutor, defense counsel focused her closing argument on McCormick's credibility, but she argued that he was not a credible witness for multiple reasons. Defense counsel also attacked Kester's credibility on the ground that he seemed drunk when he was on the witness stand, and that he previously told the defense investigator he slept through the entire altercation. Counsel also questioned what Kester had done with the knife and the pole.

Defense counsel also argued that the statement appellant gave police was as reasonable as McCormick's account of the incident. She told the jury that if it concluded that both versions of the event were reasonably plausible, the prosecutor failed to carry her burden of proving guilt beyond a reasonable doubt. According to defense counsel, "at the end of the day, the People have to prove beyond a reasonable doubt that Mr. McCormick's statement is credible, and they have not done that . . . ."

During her rebuttal, the prosecutor responded to defense counsel's various credibility arguments, encouraged the jury to follow the court's instructions and to be cognizant of the distinctions between making a credibility finding and drawing

5

reasonable inferences from circumstantial evidence. Counsel urged the jury not to be distracted by missing facts or evidence that was not necessary to prove the elements of the charge. The prosecutor then referenced a jury instruction that clarified the prosecution was not required to present all the witnesses or produce all the evidence. In making this argument, the prosecutor said: "This case isn't about, as I said before, where is the knife? It would be great to have it, but reasonable doubt applies to the elements of the case, not, 'Well, why don't we have this?' [¶] We don't have it, so you have to make a decision based on the evidence you have. The fact that it's not here isn't reasonable doubt or isn't, um, go to the element. Does this evidence as presented, does this evidence as presented prove all the elements of the case?"

Near the end of her rebuttal, the prosecutor made the following additional remark about the beyond a reasonable doubt standard of proof: "The judge has given you the instruction, and [defense counsel] held up a nice chart and it talks about other levels of doubt and it's not, you know, a strong suspicion. It's not this or that, and that's true, but it's not unreasonable doubt. It's not beyond a shadow of a doubt. I could say the same thing; I can give you all kinds of other ways of saying more than beyond a reasonable doubt. It is exactly what it says. Is there a reasonable doubt that this happened based on the evidence? [¶] Do you have the facts that you can articulate, that you can say 'I don't think it happened because of a fact, because of this, because of that.' [¶] If you believe this happened, and you have no reasonable doubt, if you believe this happened based on the evidence that was presented here in Court, then the defendant is guilty."

### *3. Analysis*

Appellant contends the prosecutor misstated the law by telling the jury that the beyond the reasonable doubt standard did not apply to every element of the People's case. " '[I]t is improper for the prosecutor to misstate the law generally [citation], and particularly to attempt to absolve the prosecution from its prima facie obligation to overcome reasonable doubt on all elements. [Citation.]' [Citation.]" (*People v. Hill* (1998) 17 Cal.4th 800, 829-830.) However, the record of closing arguments summarized above does not support appellant's factual claim. The prosecutor never said that the

6

reasonable doubt standard did not apply to certain elements of the People's case. Rather, she reviewed the elements of the assault charge and then explicitly acknowledged that the beyond a reasonable doubt standard of proof applied to those elements.

Appellant contends that the prosecutor "twisted the jury's responsibility and substantially lessened her burden" by telling the jury that credibility determinations are not subject to the beyond the reasonable doubt standard. We disagree with this argument, which is not supported by reasoned analysis or legal authority. The distinction that the prosecutor drew between the jury's assessment of witness credibility and the prosecutor's burden of proving the elements of the charged crime was not erroneous, and appellant fails to demonstrate how the jury could have been misled by it.

Appellant makes the separate argument that the prosecutor impermissibly shifted the burden of proof onto the defense near the end of counsel's rebuttal argument by asking the jury if there were "facts that you can articulate" to show that the assault did not happen. The defendant does not have the burden of producing evidence to demonstrate that a reasonable doubt exists; the jury may "simply not be persuaded by the prosecution's evidence. [Citation.]" (*People v. Hill*, *supra*, 17 Cal.4th at pp. 831-832.) Thus, a prosecutor commits misconduct if there is a reasonable likelihood that her comments "were understood by the jury to mean [that the] defendant had the burden of producing evidence to demonstrate a reasonable doubt of his guilt." (*Id*. at p. 832; see also *People v. Booker* (2011) 51 Cal.4th 141, 186.)

If viewed in isolation, the prosecutor's statement could conceivably have been misconstrued as telling the jury it had to articulate why it had a reasonable doubt before it could find appellant was not guilty. However, in context, it seems clear that the prosecutor was simply making a comment about the state of the evidence by pointing out there was no evidence that undermined McCormick's testimony about what happened. This conclusion is reinforced by considering the prosecutor's argument as a whole. During that argument the prosecutor explicitly and accurately informed the jury about the People's burden of proof. She also urged the jury to follow the court's instructions.

7

The jury was instructed with CALCRIM No. 200 regarding its obligation to follow the law as set forth in the instructions, and to disregard attorney comments that were inconsistent with the instructions. Furthermore, the jury was also instructed with CALCRIM No. 222, which told them that "[n]othing that the attorneys say is evidence." CALCRIM No. 220 correctly instructed the jury about the presumption of innocence and the prosecutor's burden of proving guilt beyond a reasonable doubt. Another instruction the jury received, CALCRIM No. 355, told them that the defendant has the right to "rely on the state of the evidence and argue that the People have failed to prove the charges beyond a reasonable doubt."

We presume that the jury followed these instructions. (*People v. Boyette* (2002) 29 Cal.4th 381, 436; see also *People v. Prince* (2007) 40 Cal.4th 1179, 1295.) We also presume that the " 'the jury treated the court's instructions as statements of law, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade.' " (*People v. Seaton* (2001) 26 Cal.4th 598, 646; see also *People v. Samayoa* (1997) 15 Cal.4th 795, 844.) Thus, we conclude that any lingering danger the jury might have misinterpreted or been misled by this one ambiguous remark the prosecutor made near the end of her rebuttal was eliminated by the jury instructions the court gave in this case.

For all of these reasons, we reject appellant's contention that the prosecutor committed prejudicial misconduct during closing argument.

**B. The Trial Court Was Not Required to Hold a Competency Hearing**

***1. Issue Presented and Guiding Principles***

Appellant contends that the trial court violated its sua sponte duty to conduct a competency hearing when faced with substantial evidence that appellant was not mentally competent to stand trial.

" ' "Both the due process clause of the Fourteenth Amendment to the United States Constitution and state law prohibit the state from trying or convicting a criminal defendant while he or she is mentally incompetent. [Citations.]" '. . ." (*People v. Sattiewhite* (2014) 59 Cal.4th 446, 464.) "A defendant is deemed competent to stand trial only if he ' "has sufficient present ability to consult with his lawyer with a reasonable

8

degree of rational understanding" ' and ' "has a rational as well as factual understanding of the proceedings against him." ' [Citation.]" (*People v. Ary* (2011) 51 Cal.4th 510, 517.)

"If presented with 'evidence that raises a reasonable doubt about a defendant's mental competence to stand trial,' a trial court must suspend the criminal proceeding and hold a hearing to determine the defendant's mental competence. [Citation.] 'A trial court's decision whether or not to hold a competence hearing is entitled to deference, because the court has the opportunity to observe the defendant during trial.' [Citation.]" (*People v. Elliott* (2012) 53 Cal.4th 535, 583.)

" ' "Evidence of incompetence may emanate from several sources, including the defendant's demeanor, irrational behavior, and prior mental evaluations. [Citations.]" [Citation.] But to be entitled to a competency hearing, "a defendant must exhibit more than bizarre . . . behavior, strange words, or a preexisting psychiatric condition that has little bearing on the question of whether the defendant can assist his defense counsel. [Citations.]" [Citation.]' [Citation.]" (*People v. Sattiewhite*, *supra*, 59 Cal.4th at pp. 464-465.)

### 2. *Background*

At appellant's arraignment on February 15, 2012, the court found he qualified for appointed counsel and stated that a public defender would be appointed to represent him. Appellant responded by requesting "to go pro per." After conducting an inquiry pursuant to *Faretta v. California* (1975) 422 U.S. 806, the court granted that request.

At the beginning of the February 28, 2012 preliminary hearing, appellant stated he was ready to proceed and that he had no motions to present. The prosecutor elicited testimony from Frank McCormick. At one point, appellant interrupted to dispute something McCormick said. The court explained appellant needed to follow the same rules that applied to an attorney. However, appellant was unable to formulate a legal objection. During his own cross-examination appellant continued to struggle with the rules governing examination of a witness. After the prosecution rested, appellant called himself as a witness and presented his version of what happened on January 9, which

9

centered on his efforts to assist a woman named Nicole Blakely who appellant believed was being held in the back room of Max Auto Top Shop against her will. The prosecutor did not offer rebuttal evidence but asked instead that the court consider whether there was a doubt about appellant's competency. In response, the court conducted the following inquiry:

"THE COURT: . . . Do you feel that you are mentally competent to go forward with this proceeding? Do you understand what we're doing here today?

"THE DEFENDANT: No, I really don't, Your Honor.

"THE COURT: Do you understand what my role is here?

"THE DEFENDANT: Yes.

"THE COURT: What is my role?

"THE DEFENDANT: To judge this case.

"THE COURT: And do you know what the prosecutor's role is over there?

"THE DEFENDANT: To represent that guy that—that just left here.

"THE COURT: And do you have any other idea of what her role is in this case?

"THE DEFENDANT: To prosecute me, Your Honor.

"THE COURT: All right. And you had requested to represent yourself in this matter?

"THE DEFENDANT: Yes, ma'am.

"THE COURT: And you also know that you need witnesses to testify on your behalf?

"THE DEFENDANT: Yes, Your Honor, but I didn't—I feel—I feel I'm not ready. I'd rather have a lawyer, Your Honor.

"THE COURT: I'm sorry; I can't hear you.

"THE DEFENDANT: I will decline representing myself. I would rather have a Public Defender.

"THE COURT: So you feel at this time that you want to abandon your representation of yourself and have an attorney step in to help you?

"THE DEFENDANT: Yes, ma'am.

10

"THE COURT: Did you wish to be heard?

"[THE PROSECUTOR]: Um—

"THE COURT: I don't think he's mentally incompetent.

"[THE PROSECUTOR]: I agree after the Court voir dired him on that . . . ."

After further discussion, the court ordered that an attorney would be appointed for appellant prior to another arraignment and that defense counsel would have the opportunity to request that the preliminary hearing be re-opened. On March 13, 2012, the public defender's office was formally appointed to represent appellant. Thereafter, appellant made three unsuccessful motions to replace his appointed counsel pursuant to *People v. Marsden* (1970) 2 Cal.3d 118.

At a May 21 *Marsden* hearing, appellant complained that his attorney had lied to him; that she was not doing the investigation he wanted done; that she was not being fair; that she was not taking his case seriously; and that they did not see eye-to-eye. Defense counsel provided responses to these complaints and explained that she did not feel there had been a breakdown in communication. She understood appellant wanted to locate a witness named Nicole and that he wanted to explore the option of a residential treatment program and she was pursuing both matters. After counsel described the work she had done and appellant had an opportunity to respond, the *Marsden* motion was denied.

At a June 6 *Marsden* hearing, appellant's primary complaints were that his attorney refused to file a motion to impeach McCormick's testimony; that she was not showing him all the evidence; and that she was not effectively fighting for his case. Defense counsel responded that she had explained why appellant's motion was not proper; that she did not have copies of the evidence he wanted but would try to get them; and that appellant was refusing to talk to her. Appellant clarified that although he did not want this attorney, he was not refusing to cooperate with her. He told the judge this was his second request for a different lawyer and asked for assurance that the record would show that the court either granted or denied it. The court denied the *Marsden* motion.

At a June 26 *Marsden* hearing, appellant complained his attorney had not spent time with him to discuss the strategy for the case; that he was not ready to go to trial

because she had not secured witnesses for him; and she made smart remarks, had an attitude and did not like men. Appellant felt that his attorney did not have a strategy for his defense and she did not make him feel like justice was being done. Again, counsel responded to each of appellant's complaints. She denied that she disliked men and she explained her efforts to locate witnesses and prepare for trial. Counsel also explained that part of the reason their visits did not go well was that appellant was focused on *Marsden* motions and often did not want to talk about the case. Counsel also stated that appellant could make their relationship work if he wanted, explaining "I'm willing to do whatever he wants and to talk with him. I think we do have a hard time communicating because he often doesn't want to communicate with me or talk to me, so—" At that point, the court denied the *Marsden* motion.

At the June 26 hearing, after the *Marsden* motion was denied, appellant made a request through his attorney for a continuance so the defense could conduct additional investigation. Appellant personally waived time on the record. Speaking for himself, appellant also requested that the court "Document" that his *Marsden* motion was denied. He also asked for a bail reduction, arguing it was too high, he was a Vallejo native who was not going anywhere, he had not been on parole, and he had nobody to co-sign for him.

Appellant's trial was conducted in September 2012. Prior to jury selection, the court and counsel discussed amending the information to strike an allegation that the charged assault with a deadly weapon was committed "by means likely to produce GBI" and to clarify that a separate special allegation of GBI pertained to the assault of McCormick. Appellant interjected that he did not understand the issue and asked if his attorney could explain it to him. The court allowed defense counsel to confer with her client, after which counsel advised the court that the appellant agreed with the amendment.

### 3. Analysis

Appellant contends the question of his competency arose "almost as soon as he opened his mouth at the preliminary hearing" and continued throughout that proceeding.

12

The preliminary hearing transcript shows that appellant did not understand the rules for conducting a cross-examination, that he was overly anxious to tell his side of the story, and that he was not a polished or effective speaker. These circumstances are evidence that appellant was not equipped or qualified to represent himself but they are not evidence sufficient to require the trial court to conduct a competency hearing because they are not necessarily indicative of mental incompetence to stand trial. Furthermore, the superior court, who was in the best position to evaluate appellant's competency, did not ignore these circumstances. It conducted an inquiry which clarified that appellant's problem at the preliminary hearing was not mental incompetence, but that he wanted and needed a lawyer to assist him.

Appellant contends that each of his *Marsden* motion hearings produced substantial evidence of his mental incompetence because the complaints he presented were "incoherent," and the court should have realized that his "challenges" communicating those complaints paralleled his "frustrated attempts to assist in his own defense." As reflected in our summary of the *Marsden* proceedings, we disagree with appellant that his complaints were incoherent. Appellant often misused words, and he was not a talented public speaker, but the record demonstrates that both the trial court and defense counsel understood the complaints that appellant was making.

Appellant insists that it was "painfully evident that he was not communicating successfully with his counsel and that this failure of communication was interfering with his defense." Again the record shows otherwise. At each *Marsde*n hearing, appellant's defense counsel was able to respond to appellant's complaints and provide explanations for the things she did or did not do. Furthermore, appellant misconstrues disagreements about how to handle this case as evidence that he and his attorney did not understand each other.

Finally, appellant's extremely selective summary of the pretrial proceeding ignores the many indications that he understood the proceedings against him and had sufficient ability to consult with his lawyer. As reflected in our summary above, appellant understood and exercised his right to represent himself; he understood and

exercised his right to request appointed counsel; and he understood and repeatedly exercised his right thereafter to request different appointed counsel. The record also shows that appellant had his own ideas about trial strategy, what motions to make and what witnesses to call, but the fact that his trial counsel rejected those ideas does not mean she did not understand them.

For all of these reasons, we reject the contention that the superior court overlooked substantial evidence of appellant's mental incompetency.

## IV.

## DISPOSITION

The judgment is affirmed.

_____
RUVOLO, P. J.

We concur:


_____
REARDON, J.


_____
RIVERA, J.

15

A137810, *People v. Brooks*